[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 10, 2001
THOMAS K. KAHN
CLERK

_____

No. 01-12200

_____

D. C. Docket No. 01-00701-CV-CAP-1

SUNTRUST BANK, as Trustee of the
Stephen Mitchell trusts f.b.o. Eugene
Muse Mitchell and Joseph Reynolds Mitchell,

Plaintiff-Appellee,

versus

HOUGHTON MIFFLIN COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 10, 2001)**

Before BIRCH, MARCUS and WOOD\*, Circuit Judges.

_____
\*Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by
designation.

BIRCH, Circuit Judge:

In this opinion, we decide whether publication of The Wind Done Gone ("TWDG"), a fictional work admittedly based on Margaret Mitchell's Gone With the Wind ("GWTW"), should be enjoined from publication based on alleged copyright violations. The district court granted a preliminary injunction against publication of TWDG because it found that Plaintiff-Appellee SunTrust Bank ("SunTrust") met the four-part test governing preliminary injunctions. We VACATE the injunction and REMAND for consideration of the remaining claims.

## I. BACKGROUND

A. Procedural History

SunTrust is the trustee of the Mitchell Trust, which holds the copyright in GWTW. Since its publication in 1936, GWTW has become one of the best-selling books in the world, second in sales only to the Bible. The Mitchell Trust has actively managed the copyright, authorizing derivative works and a variety of commercial items. It has entered into a contract authorizing, under specified conditions, a second sequel to GWTW to be published by St. Martin's Press. The

Mitchell Trust maintains the copyright in all of the derivative works as well. See 17 U.S.C. § 103.[1]

Alice Randall, the author of TWDG, persuasively claims that her novel is a critique of GWTW's depiction of slavery and the Civil-War era American South. To this end, she appropriated the characters, plot and major scenes from GWTW into the first half of TWDG. According to SunTrust, TWDG "(1) explicitly refers to [GWTW] in its foreword; (2) copies core characters, character traits, and relationships from [GWTW]; (3) copies and summarizes famous scenes and other elements of the plot from [GWTW]; and (4) copies verbatim dialogues and descriptions from [GWTW]." SunTrust Bank v. Houghton Mifflin Co., 136 F. Supp. 2d 1357, 1364 (N.D.Ga. 2001), vacated, 252 F.3d 1165 (11th Cir. 2001). Defendant-Appellant Houghton Mifflin, the publisher of TWDG, does not contest the first three allegations,[2] but nonetheless argues that there is no substantial similarity between the two works or, in the alternative, that the doctrine of fair use protects TWDG because it is primarily a parody of GWTW.

---

[1]Hereafter, the Copyright Act of 1976 shall be referred to by only the section number of the Act.

[2]Houghton Mifflin denies that there are passages from GWTW copied verbatim in TWDG.

3

After discovering the similarities between the books, SunTrust asked Houghton Mifflin to refrain from publication or distribution of TWDG, but Houghton Mifflin refused the request. Subsequently, SunTrust filed an action alleging copyright infringement, violation of the Lanham Act, and deceptive trade practices, and immediately filed a motion for a temporary restraining order and a preliminary injunction.

After a hearing, the district court granted the motion, preliminarily enjoining Houghton Mifflin from "further production, display, distribution, advertising, sale, or offer for sale of" TWDG. SunTrust Bank, 136 F. Supp. 2d at 1386. In a thorough opinion, the court found that "the defendant's publication and sale of [TWDG would] infringe the plaintiff's copyright interests as protected under the copyright laws." Id. Houghton Mifflin appealed. At oral argument, we issued an order vacating the injunction on the grounds that it was an unconstitutional prior restraint. SunTrust Bank v. Houghton Mifflin Co., 252 F. 3d 1165 (11th Cir. 2001). We now vacate that order and issue this more comprehensive opinion.

B.      Standard of Review

"We review the district court's grant of a preliminary injunction for abuse of discretion." Warren Pub., Inc. v. Microdos Data Corp., 115 F.3d 1509, 1516 (11th Cir. 1997) (en banc). We review decisions of law *de novo* and findings of fact for

4

clear error.  Mitek Holdings, Inc. v. Arce Eng'g Co., Inc., 89 F.3d 1548, 1554

(11th Cir. 1996).

## II.  DISCUSSION

Our primary focus at this stage of the case is on the appropriateness of the

injunctive relief granted by the district court.  In our analysis, we must evaluate the

merits of SunTrust's copyright infringement claim, including Houghton Mifflin's

affirmative defense of fair use.[3]  As we assess the fair-use defense, we examine to

what extent a critic may use a work to communicate her criticism of the work

without infringing the copyright in that work.  To approach these issues in the

proper framework, we should initially review the history of the Constitution's

Copyright Clause and understand its relationship to the First Amendment.

A.      History and Development of the Copyright Clause

The Copyright Clause finds its roots in England, where, in 1710, the Statute

of Anne "was designed to destroy the booksellers' monopoly of the booktrade and

---

[3]I believe that fair use should be considered an affirmative *right* under the 1976 Act, rather than merely an affirmative defense, as it is defined in the Act as a use that is not a violation of copyright.  See Bateman v. Mneumonics, Inc., 79 F.3d 1532, 1542 n.22 (11th Cir. 1996).  However, fair use is commonly referred to an affirmative defense, see Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590, 114 S. Ct. 1164, 1177 (1994), and, as we are bound by Supreme Court precedent, we will apply it as such.  See also David Nimmer, A Riff on Fair Use in the Digital Millennium Copyright Act, 148 U. PA. L. REV. 673, 714 n. 227 (2000) (citing Bateman).  Nevertheless, the fact that the fair use right must be procedurally asserted as an affirmative defense does not detract from its constitutional significance as a guarantor to access and use for First Amendment purposes.

to prevent its recurrence." L. Ray Patterson, <u>Understanding the Copyright Clause</u>, 47 J. COPYRIGHT SOC'Y USA 365, 379 (2000).  This Parliamentary statute assigned copyright in books to authors, added a requirement that only a new work could be copyrighted, and limited the duration, which had been perpetual, to two fourteen-year terms.  8 Anne, C.19 (1710), <u>reprinted in</u> 8 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 7-5 (2001).   It is clear that the goal of the Statute of Anne was to encourage creativity and ensure that the public would have free access to information by putting an end to "the continued use of copyright as a device of censorship." Patterson at 379.[4]  The Framers of the U.S. Constitution relied on this statute when drafting the Copyright Clause of our Constitution,[5] which reads,

> The Congress shall have Power . . . to promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their respective Writings . . . .

---

[4]The Statute of Anne providing for copyright is introduced as "[a]n act for the encouragement of learning," and has a preamble that states one of the purposes as "the encouragement of learned men to compose and write useful books."  8 Anne, C.19 (1710), <u>reprinted in</u> 8 Nimmer § 7-5.

[5]<u>See</u> Edward C. Walterscheid, <u>The Remarkable–and Irrational–Disparity Between the Patent Term and the Copyright Term</u>, 83 J. PAT. & TRADEMARK OFF. SOC'Y 233, 235 (2001) ("The American Copyright Act of 1790 simply copied this same basic scheme [from the Statute of Anne] into the new American copyright law."); Pierre N. Leval, <u>Nimmer Lecture: Fair Use Rescued</u>, 44 UCLA L. REV. 1449, 1450 (1997) ("The law of copyright, [was] fashioned by the Statute of Anne in 1710 and recognized in our Constitution.").

U.S. CONST. art. 1, § 8, cl. 8. Congress directly transferred the principles from the Statute of Anne into the copyright law of the United States in 1783, first through a recommendation to the states to enact similar copyright laws,[6] and then in 1790, with the passage of the first American federal copyright statute.[7]

The Copyright Clause was intended "to be the engine of free expression." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 558, 105 S. Ct. 2218, 2229 (1985). To that end, copyright laws have been enacted achieve the three main goals: the promotion of learning, the protection of the public domain, and the granting of an exclusive right to the author.

1. Promotion of Learning

In the United States, copyright has always been used to promote learning by guarding against censorship.[8] Throughout the nineteenth century, the copyright in literature was limited to the right "to publish and vend books." Patterson, at 383. The term "copy" was interpreted literally; an author had the right only to prevent

---

[6]"Resolution of the Continental Congress Respecting Copyright" (1783), reprinted in 8 Nimmer § 7-11.

[7]1 Stat. 124 (May 31, 1790), reprinted in 8 Nimmer § 7-41 ("AN ACT for the encouragement of learning . . .").

[8]See Jane C. Ginsburg, Creation and Commercial Value: Copyright Protection in Works of Information, 90 COLUM. L. REV. 1865, 1873 (1990) ("[T]he 1710 English Statute of Anne, the 1787 United States Constitution, and the 1790 United States federal copyright statute all characterized copyright as a device to promote the advancement of knowledge.").

others from copying and selling her particular literary work.  See Stowe v. Thomas,

23 F. Cas. 201 (C.C.E.D. Pa. 1853) (holding that a translation of Uncle Tom's

Cabin into German was not a copyright infringement because it was not a copy of

the work as it was published).[9]  This limited right ensured that a maximum number

of new works would be created and published.  It was not until the 1909 Act,

which codified the concept of a derivative work, that an author's right to protect

his original work against imitation was established.  This change more closely

represents current statutory copyright law and is consistent with copyright's

constitutional mandate.

As a further protection of the public interest, until 1976, statutory copyright

law required that a work be published before an author was entitled to a copyright

in that work.  Therefore, in order to have the sole right of publication for the

statutory period, the author was first required to make the work available to the

public.  In 1976, copyright was extended to include any work "fixed in any

tangible medium of expression" in order to adapt the law to technological

advances.  § 102(a).  Thus, the publication requirement was removed, but the fair

---

[9]Under modern copyright, such a right to translate would enjoy protection as a "derivative work."   §§ 101 and 106.  In Folsom v. Marsh, 9 F.Cas. 342 (C.C.Mass. 1841), Justice Story created the concept of "fair use," which actually expanded the copyright monopoly, since until that time a translation or abridgement was not considered an infringement.

8

use right was codified to maintain the constitutionally mandated balance to ensure that the public has access to knowledge.

The Copyright Act promotes public access to knowledge because it provides an economic incentive for authors to publish books and disseminate ideas to the public. Harper & Row, 471 U.S. at 558, 105 S. Ct. at 2229 ("By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas."). The Supreme Court has recognized that "[t]he monopoly created by copyright thus rewards the individual author in order to benefit the public." Id. at 546, 105 S. Ct. at 2223 (quoting Sony Corp. of America v. Univ. City Studios, Inc., 464 U.S. 417, 477, 104 S. Ct. 774, 807 (1984) (Blackmun, J.,dissenting)). Without the limited monopoly, authors would have little economic incentive to create and publish their work. Therefore, by providing this incentive, the copyright law promotes the public access to new ideas and concepts.

2. Protection of the Public Domain

The second goal of the Copyright Clause is to ensure that works enter the public domain after an author's rights, exclusive, but limited, have expired. Parallel to the patent regime, the limited time period of the copyright serves the dual purpose of ensuring that the work will enter the public domain and ensuring

9

that the author has received "a fair return for [her] labors." Harper & Row, 471 U.S. at 546, 105 S. Ct. at 2223. This limited grant "is intended to motivate the creative activity of authors . . . by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." Sony, 464 U.S. at 429, 104 S. Ct. at 782. The public is protected in two ways: the grant of a copyright encourages authors to create new works, as discussed in section II.A.1., and the limitation ensures that the works will eventually enter the public domain, which protects the public's right of access and use.[10]

3. Exclusive Rights of the Author

Finally, the Copyright Clause grants the author limited exclusive rights in order to encourage the creation of original works. Before our copyright jurisprudence developed, there were two separate theories of copyright in England – the natural law copyright, which was the right of first publication, and the statutory copyright, which was the right of continued publication. The natural law copyright, which is not a part of our system, implied an ownership in the work itself, and thus was preferred by the booksellers and publishers striving to maintain

---

[10]See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349, 111 S. Ct. 1282, 1290 (1991) ("The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'").

their monopoly over literature as well as by the Crown to silence "seditious" writings. Even after passage of the Statute of Anne, the publishers and booksellers resisted the loss of their monopoly in the courts for more than sixty years. Finally, in 1774, the House of Lords ruled that the natural law copyright, that is, the ownership of the work itself, expires upon publication of the book, when the statutory copyright attaches. Patterson at 382.

This bifurcated system was carried over into our copyright law. As of the 1909 Act, an author had "state common law protection [that] persisted until the moment of general publication." Estate of Martin Luther King, Jr. v. CBS, Inc., 194 F.3d 1211, 1214 (11th Cir. 1999). After the work was published, the author was entitled to federal statutory copyright protection if she had complied with certain federal requirements (i.e. publication with notice). If not, the work was released into the public domain. Id. The system illustrates that the author's ownership is in the copyright, and not in the work itself, for if the author had an ownership interest in the work itself, she would not lose that right if she published the book without complying with federal statutory copyright requirements. Compliance with the copyright law results in the guarantee of copyright to the author for a limited time, but the author never owns the work itself. § 202

11

("Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.").

This has an important impact on modern interpretation of copyright, as it emphasizes the distinction between ownership of the work, which an author does not possess, and ownership of the copyright, which an author enjoys for a limited time. In a society oriented toward property ownership, it is not surprising to find many that erroneously equate the work with the copyright in the work and conclude that if one owns the copyright, they must also own the work. However, the fallacy of that understanding is exposed by the simple fact that the work continues to exist after the term of copyright associated with the work has expired. "The copyright is not a natural right inherent in authorship. If it were, the impact on market values would be irrelevant; any unauthorized taking would be obnoxious." Pierre Leval, Towards a Fair Use Standard, 105 Harv. L. Rev. 1105, 1124 (1990).

B. The Union of Copyright and the First Amendment

The Copyright Clause and the First Amendment,[11] while intuitively in conflict,[12] were drafted to work together to prevent censorship; copyright laws were enacted in part to prevent private censorship and the First Amendment was enacted to prevent public censorship.[13] There are "[c]onflicting interests that must be accommodated in drawing a definitional balance" between the Copyright Clause and the First Amendment. 1 Nimmer § 1.10[B][1]. In establishing this balance "[o]n the copyright side, economic encouragement for creators must be preserved and the privacy of unpublished works recognized. Freedom of speech[, on the other hand,] requires the preservation of a meaningful public or democratic dialogue, as well as the uses of speech as a safety valve against violent acts, and as an end in itself." Id.

In copyright law, the balance between the First Amendment and copyright is preserved, in part, by the idea/expression dichotomy and the doctrine of fair use. See Eldred v. Reno, 239 F.3d 372, 375 (D.C. Cir. 2001) ("The first amendment

_____

[11]"Congress shall make no law . . . abridging the freedom of speech . . ." U.S. CONST. amend. I.

[12]While the First Amendment disallows laws that abridge the freedom of speech, the Copyright Clause calls specifically for such a law.

[13]See Rebecca Tushnet, Copyright as a Model for Free Speech Law: What Copyright Has in Common with Anti-Pornography Laws, Campaign Finance Reform, and Telecommunications Regulation, 42 B. C. L. REV. 1, 2 (2000) ("The First Amendment gets government off speakers' backs, while the Copyright Act enables speakers to make money from speaking and thus encourages them to enter the public marketplace of ideas.").

13

objection . . . was misplaced '[i]n view of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use.'") (quoting Harper & Row, 471 U.S. at 560, 105 S. Ct. at 2218).

1. The Idea/ Expression Dichotomy

Copyright cannot protect an idea, only the expression of that idea. Baker v. Selden, 101 U.S. 99 (1879); Mitek, 89 F.3d at 1556 n.19; Bell South Adver. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc., 999 F.2d 1436, 1445 (1993); codified in § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). The result is that "copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by the work." Feist, 499 U.S. at 349-50, 111 S. Ct. at 1290. It is partly through this idea/expression dichotomy that copyright law embodies the First Amendment's underlying goal of encouraging open debate and the free exchange of ideas. See Harper & Row, 471 U.S. at 556, 105 S. Ct. at 2228 (citing as correct the Second Circuit's observation that

14

"copyright's idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression"); <u>Worldwide Church of God v. Philadelphia Church of God</u>, 227 F.3d 1110, 1115 (9th Cir. 2000), <u>cert. denied</u> __ U.S. __, 121 S. Ct. 1486 (2001) ("The public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts."); <u>see also</u> 1 Nimmer § 1-10[C][2] ("In general, the democratic dialogue – a self-governing people's participation in the marketplace of ideas – is adequately served if the public has access to an author's ideas, and such loss to the dialogue as results from inaccessibility to an author's 'expression' is counterbalanced by the greater public interest in the copyright system.").  Holding an infringer liable in copyright for copying the expression of another author's ideas does not impede First Amendment goals because the public purpose has been served – the public already has access to the idea or the concepts.[14]  A new author may use or discuss the idea, but must do so using her own original expression.

    2.  Fair Use

---

[14]<u>See</u> 1 Nimmer § 1.10[B][2] ("It is exposure to ideas, and not to their particular expression, that is vital if self-governing people are to make informed decisions.").

15

First Amendment privileges are also preserved through the doctrine of fair use.[15] Until codification of the fair-use doctrine in the 1976 Act, fair use was a judge-made right developed to preserve the constitutionality of copyright legislation by protecting First Amendment values. Had fair use not been recognized as a right under the 1976 Act, the statutory abandonment of publication as a condition of copyright that had existed for over 200 years would have jeopardized the constitutionality of the new Act because there would be no statutory guarantee that new ideas, or new expressions of old ideas, would be accessible to the public. Included in the definition of fair use are "purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research." § 107. The exceptions carved out for these purposes are at the heart of fair use's protection of the First Amendment, as they allow later authors to use a previous author's copyright to introduce new ideas or concepts to the public. Therefore, within the limits of the fair-use test,[16] any use of a copyright is permitted to fulfill one of the important purposes listed in the statute.

Because of the First Amendment principles built into copyright law through the idea/expression dichotomy and the doctrine of fair use, courts often need not

---

[15] § 107 ("[F]air use of a copyrighted work . . . for purposes such as criticism [or] comment . . . is not an infringement of copyright.").

[16]See discussion section II.C.1.b.

16

entertain related First Amendment arguments in a copyright case. See, e.g., Eldred, 239 F.3d at 376 (where the works in question "are by definition under copyright; that puts the works on the latter half of the 'idea/expression dichotomy' and makes them subject to fair use. This obviates further inquiry under the First Amendment."); Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 74 (2d Cir. 1999) ("We have repeatedly rejected First Amendment challenges to injunctions from copyright infringement on the ground that First Amendment concerns are protected by and coextensive with the fair use doctrine."); Los Angeles News Serv. v. Tullo, 973 F.2d 791, 795 (9th Cir. 1992) ("First Amendment concerns are also addressed in the copyright field through the 'fair use' doctrine.").[17]

The case before us calls for an analysis of whether a preliminary injunction was properly granted against an alleged infringer who, relying largely on the doctrine of fair use, made use of another's copyright for comment and criticism. As discussed herein, *copyright does not immunize a work from comment and criticism*. Therefore, the narrower question in this case is to what extent a critic may use the protected elements of an original work of authorship to communicate her criticism without infringing the copyright in that work. As will be discussed

---

[17]For a more policy-based discussion, see 1 Nimmer § 1.10[D].

below, this becomes essentially an analysis of the fair use factors. As we turn to the analysis required in this case, we must remain cognizant of the First Amendment protections interwoven into copyright law.

C. Appropriateness of Injunctive Relief

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl., 896 F.2d 1283, 1284 (11th Cir. 1990). The Copyright Act specifically vests the federal courts with power to grant injunctions "to prevent or restrain infringement of a copyright." § 502(a). While injunctive relief may be particularly appropriate in cases involving simple copying or "piracy" of a copyrighted work, the Supreme Court has cautioned that such relief may not be consistent with the goals of copyright law in cases in which the alleged infringer of the copyright has a colorable fair-use defense. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 n.10, 114 S. Ct. 1164, 1171 n.10 (1994).[18]

The basic framework for our analysis remains, however, the standard test governing the issuance of preliminary injunctions. SunTrust is not entitled to relief

---

[18]The Supreme Court reiterated this point in New York Times v. Tasini, __ U.S. __, __, 121 S. Ct. 2381, 2393 (2001).

in the form of a preliminary injunction unless it has proved each of the following four elements: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest." Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998).

### 1. Substantial Likelihood of Success on the Merits

#### a. Prima Facie Copyright Infringement

The first step in evaluating the likelihood that SunTrust will succeed on the merits is to determine whether it has established the prima facie elements of a copyright infringement claim: (1) that SunTrust owns a valid copyright in GWTW and (2) that Randall copied *original* elements of GWTW in TWDG. Feist, 499 U.S. at 361, 111 S. Ct. at 1296; Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000). The district court found that SunTrust had carried its burden on both of these elements.

The first element, SunTrust's ownership of a valid copyright in GWTW, is not disputed. Houghton Mifflin does assert, however, that SunTrust did not establish the second element of infringement, that TWDG appropriates copyright-

19

protected expression from <u>GWTW</u>. In order to prove copying, SunTrust was required to show a "substantial similarity" between the two works such that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." <u>Leigh</u>, 212 F.3d at 1214 (quoting <u>Original Appalachian Artworks, Inc. v. Toy Loft, Inc.</u>, 684 F.2d 821, 829 (11th Cir. 1982)). Not all copying of a work is actionable, however, for, as discussed in section II.B.1., "no author may copyright facts or ideas. The copyright is limited to those aspects of the work–termed 'expression'–that display the stamp of the author's originality." <u>Harper & Row</u>, 471 U.S. at 547, 105 S. Ct. at 2224 (citation omitted). Thus, we are concerned with substantial similarities between <u>TWDG</u> and <u>GWTW</u> only to the extent that they involve the copying of original, protected expression. <u>Leigh</u>, 212 F.3d at 1214.[19]

There is no bright line that separates the protectable expression from the nonprotectable idea in a work of fiction. While often referred to as a test for distinguishing the idea from the expression, Judge Learned Hand's famous

---

[19]Originally the word "copie" was a noun, indicating the manuscript. Ownership of the "copie" thus meant ownership of the manuscript for the purposes of publishing it. Today, "copy" has become a verb, meaning the act of reproduction of a work. But in the development of copyright law it was intended to be a term of art, indicating a reproduction of a work for publication. Failure to understand and apply this distinction has confused many courts (assisted by overzealous advocates) into too expansive a view of the scope of the copyright monopoly.

statement in <u>Nichols v. Universal Pictures Corp.</u>, 45 F.2d 119 (2d Cir. 1930), is actually nothing more than a concise restatement of the problem facing the courts:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at time might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

<u>Id.</u> at 121. At one end of the spectrum, *scenes a faire*–the stock scenes and hackneyed character types that "naturally flow from a common theme"–are considered "ideas," and therefore are not copyrightable. <u>Beal v. Paramount Pictures Corp.</u>, 20 F.3d 454, 459-60 (11th Cir. 1994). But as plots become more intricately detailed and characters become more idiosyncratic, they at some point cross the line into "expression" and are protected by copyright. <u>See</u> 1 Nimmer § 2.12 (2001).

After conducting a thorough comparison of the two works, the district court found that <u>TWDG</u> copied far more than unprotected <u>scenes a faire</u> from <u>GWTW</u>: "[<u>TWDG</u>] uses fifteen fictional characters from [<u>GWTW</u>], incorporating their physical attributes, mannerisms, and the distinct features that Ms. Mitchell used to describe them, as well as their complex relationships with each other. Moreover, the various [fictional] locales, . . . settings, characters, themes, and plot of

21

[TWDG] closely mirror those contained in [GWTW]." SunTrust, 136 F.Supp.2d at 1367.

Our own review of the two works reveals substantial use of GWTW. TWDG appropriates numerous characters, settings, and plot twists from GWTW. For example, Scarlett O'Hara, Rhett Butler, Bonnie Butler, Melanie Wilkes, Ashley Wilkes, Gerald O'Hara, Ellen O'Hara, Mammy, Pork, Dilcey, Prissy, Belle Watling, Carreen O'Hara, Stuart and Brenton Tarleton, Jeems, Philippe, and Aunt Pittypat, all characters in GWTW, appear in TWDG. Many of these characters are renamed in TWDG: Scarlett becomes "Other," Rhett Butler becomes "R.B.," Pork becomes "Garlic," Prissy becomes "Miss Priss," Philippe becomes "Feleepe," Aunt Pittypat becomes "Aunt Pattypit," etc. In several instances, Randall renamed characters using Mitchell's descriptions of those characters in GWTW: Ashley becomes "Dreamy Gentleman," Melanie becomes "Mealy Mouth," Gerald becomes "Planter." The fictional settings from GWTW receive a similarly transparent renaming in TWDG: Tara becomes "Tata," Twelve Oaks Plantation becomes "Twelve Slaves Strong as Trees." TWDG copies, often in wholesale fashion, the descriptions and histories of these fictional characters and places from GWTW, as well as their relationships and interactions with one another. TWDG appropriates or otherwise explicitly references many aspects of GWTW's plot as

22

well, such as the scenes in which Scarlett kills a Union soldier and the scene in which Rhett stays in the room with his dead daughter Bonnie, burning candles. After carefully comparing the two works, we agree with the district court that, particularly in its first half, TWDG is largely "an encapsulation of [GWTW] [that] exploit[s] its copyrighted characters, story lines, and settings as the palette for the new story." SunTrust, 136 F.Supp.2d at 1367.

Houghton Mifflin argues that there is no substantial similarity between TWDG and GWTW because the retelling of the story is an inversion of GWTW: the characters, places, and events lifted from GWTW are often cast in a different light, strong characters from the original are depicted as weak (and vice-versa) in the new work, the institutions and values romanticized in GWTW are exposed as corrupt in TWDG. While we agree with Houghton Mifflin that the characters, settings, and plot taken from GWTW are vested with a new significance when viewed through the character of Cynara[20] in TWDG, it does not change the fact that they are the very same copyrighted characters, settings, and plot.

b. Fair Use

---

[20]"Cynara" is the name of the poem by Ernest Dowson, from which GWTW's title is derived ("I have forgot much, Cynara! gone with the wind, . . .").

Randall's appropriation of elements of GWTW in TWDG may nevertheless

not constitute infringement of SunTrust's copyright if the taking is protected as a

"fair use." The codification of the fair-use doctrine in the Copyright Act provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

§ 107.[21] In assessing whether a use of a copyright is a fair use under the statute,

we bear in mind that the examples of possible fair uses given are illustrative rather

than exclusive, and that "[a]ll [of the four factors] are to be explored, and the

results weighed together in light of the purposes of copyright." Campbell, 510

---

[21]Interestingly, these elements harken back to Folsom v. Marsh, supra, – where Justice Story first articulated the concept of "fair use."

U.S. at 577-78, 114 S. Ct. at 1170-71.[22]  In light of the discussion in §§ IIA and B,

one of the most important purposes to consider is the free flow of ideas –

particularly criticism and commentary.

Houghton Mifflin argues that TWDG is entitled to fair-use protection as a

parody of GWTW.  In Campbell, the Supreme Court held that parody, although not

specifically listed in § 107, is a form of comment and criticism that may constitute

a fair use of the copyrighted work being parodied.  Id. at 579, 114 S. Ct. at 1171.

Parody, which is directed toward a particular literary or artistic work, is

distinguishable from satire, which more broadly addresses the institutions and

mores of a slice of society.  Id. at 580-81, 581 n.15, 114 S. Ct. at 1172, 1172 n.15.

Thus, "[p]arody needs to mimic an original to make its point, and so has some

claim to use the creation of its victim's . . . imagination, whereas satire can stand

on its own two feet and so requires justification for the very act of borrowing."  Id.

at 580-81, 114 S. Ct. at 1172.

The fact that parody by definition must borrow elements from an existing

work, however, does not mean that every parody is shielded from a claim of

copyright infringement as a fair use.  "The [Copyright] Act has no hint of an

evidentiary preference for parodists over their victims, and no workable

---

[22]See section II.A. for a discussion of the purposes of copyright.

presumption for parody could take account of the fact that parody often shades into satire when society is lampooned through its creative artifacts, or that a work may contain both parodic and nonparodic elements." Id. at 581, 114 S. Ct. at 1172. Therefore, Houghton Mifflin's fair-use defense of parody, like any other claim of fair use, must be evaluated in light of the factors set out in § 107 and the constitutional purposes of copyright law. Id., 114 S. Ct. at 1172.

Before considering a claimed fair-use defense based on parody, however, the Supreme Court has required that we ensure that "a parodic character may reasonably be perceived" in the allegedly infringing work. Id. at 582, 114 S. Ct. at 1173. The Supreme Court's definition of parody in Campbell, however, is somewhat vague. On the one hand, the Court suggests that the aim of parody is "comic effect or ridicule," but it then proceeds to discuss parody more expansively in terms of its "commentary" on the original. Id. at 580, 114 S. Ct. at 1172. In light of the admonition in Campbell that courts should not judge the quality of the work or the success of the attempted humor in discerning its parodic character, we choose to take the broader view. For purposes of our fair-use analysis, we will treat a work as a parody if its aim is to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to

scholarly or journalistic, work.[23]  Under this definition, the parodic character of

TWDG is clear.  TWDG is not a general commentary upon the Civil-War-era

American South, but a specific criticism of and rejoinder to the depiction of slavery

and the relationships between blacks and whites in GWTW.  The fact that Randall

chose to convey her criticisms of GWTW through a work of fiction, which she

contends is a more powerful vehicle for her message than a scholarly article, does

not, in and of itself, deprive TWDG of fair-use protection.  We therefore proceed

to an analysis of the four fair-use factors.

### i.  Purpose and Character of the Work

The first factor in the fair-use analysis, the purpose and character of the

allegedly infringing work, has several facets.  The first is whether TWDG serves a

commercial purpose or nonprofit educational purpose.   § 107(1).  Despite

whatever educational function TWDG may be able to lay claim to, it is

undoubtedly a commercial product.[24]  As the Supreme Court has stated, "[t]he crux

---

[23]The benefit of our approach to "parody," which requires no assessment of whether or not a work is humorous, is apparent from the arguments made by the parties in this case. SunTrust quotes Michiko Kakutani's review of TWDG in the New York Times, in which she states that the work is "decidedly unfunny."  Houghton Mifflin, on the other hand, claims that TWDG is an example of "African-American humor," which, Houghton Mifflin strongly implies, non-African-American judges are not permitted to evaluate without assistance from "experts." Under our approach, we may ignore Houghton Mifflin's questionable argument and simply bypass what would always be a wholly subjective inquiry.

[24]Randall did not choose to publish her work of fiction on the internet free to all the world to read; rather, she chose a method of publication designed to generate economic profit.

of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562, 105 S. Ct. at 2231. The fact that TWDG was published for profit is the first factor weighing against a finding of fair use. Id., 105 S. Ct. at 2231. However, TWDG's for-profit status is strongly overshadowed and outweighed in view of its highly transformative use of GWTC's copyrighted elements. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell, 510 U.S. at 579, 114 S. Ct. at 1171. "[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." Id.. A work's transformative value is of special import in the realm of parody, since a parody's aim is, by nature, to transform an earlier work.

The second factor in the "purpose and character" analysis relevant to this case is to what extent TWDG's use of copyrighted elements of GWTW can be said to be "transformative." The inquiry is "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or

28

message." Campbell, 510 U.S. at 579, 114 S. Ct. at 1171 (citations and internal punctuation omitted). The issue of transformation is a double-edged sword in this case. On the one hand, the story of Cynara and her perception of the events in TWDG certainly adds new "expression, meaning, [and] message" to GWTW. From another perspective, however, TWDG's success as a pure work of fiction depends heavily on copyrighted elements appropriated from GWTW to carry its own plot forward.

However, as noted above, TWDG is more than an abstract, pure fictional work. It is principally and purposefully a critical statement that seeks to rebut and destroy the perspective, judgments, and mythology of GWTW. Randall's literary goal is to explode the romantic, idealized portrait of the antebellum South during and after the Civil War. In the world of GWTW, the white characters comprise a noble aristocracy whose idyllic existence is upset only by the intrusion of Yankee soldiers, and, eventually, by the liberation of the black slaves. Through her characters as well as through direct narration, Mitchell describes how both blacks and whites were purportedly better off in the days of slavery: "The more I see of emancipation the more criminal I think it is. It's just ruined the darkies," says Scarlett O'Hara. GWTW at 639. Free blacks are described as "creatures of small intelligence . . . [l]ike monkeys or small children turned loose among treasured

29

objects whose value is beyond their comprehension, they ran wild – either from perverse pleasure in destruction or simply because of their ignorance." Id. at 654. Blacks elected to the legislature are described as spending "most of their time eating goobers and easing their unaccustomed feet into and out of new shoes." Id. at 904.

As the district court noted: "The earlier work is a third-person epic, whereas the new work is told in the first-person as an intimate diary of the life of Cynara. Thematically, the new work provides a different viewpoint of the antebellum world." 136 F. Supp. 2d at 1367. While told from a different perspective, more critically, the story is transformed into a very different tale, albeit much more abbreviated. Cynara's very language is a departure from Mitchell's original prose; she acts as the voice of Randall's inversion of GWTW. She is the vehicle of parody; she is its means – not its end. It is clear within the first fifty pages of Cynara's fictional diary that Randall's work flips GWTW's traditional race roles, portrays powerful whites as stupid or feckless[25], and generally sets out to demystify GWTW and strip the romanticism from Mitchell's specific account of this period of our history. Approximately the last half of TWDG tells a completely new story

---

[25] On pages 62-63 of TWDG, for example, Miss Priss explains that Mammy killed white male heirs to the plantation dynasty when they were babies in order to seal Garlic's and the other African-Americans' control over the drunken Planter. "What would we a done with a sober white man on this place?" Says Miss Priss. TWDG at 63.

that, although involving characters based on GWTW characters, features plot elements found nowhere within the covers of GWTW.

Where Randall refers directly to Mitchell's plot and characters, she does so in service of her general attack on GWTW. In GWTW, Scarlett O'Hara often expresses disgust with and condescension towards blacks; in TWDG, Other, Scarlett's counterpart, is herself of mixed descent. In GWTW, Ashley Wilkes is the initial object of Scarlett's affection; in TWDG, he is homosexual.[26] In GWTW, Rhett Butler does not consort with black female characters and is portrayed as the captain of his own destiny. In TWDG, Cynara ends her affair with Rhett's counterpart, R., to begin a relationship with a black Congressman; R. ends up a washed out former cad. In TWDG, nearly every black character is given some redeeming quality – whether depth, wit, cunning, beauty, strength, or courage – that their GWTW analogues lacked.

---

[26] Randall's parodic intent vis-a-vis Ashley becomes manifest when the two works are read side-by-side. Mitchell has Gerald describe Ashley Wilkes: "The Wilkes are different from any of our neighbors-different from any family I ever knew. They are queer folk, and it's best that they marry their cousins and keep their queerness to themselves . . . And when I say queer, it's not crazy I'm meaning . . . there's no understanding him at all. . . . tell me true, do you understand his foderol about books and poetry and music and oil paintings and such foolishness?" GWTW at 34. Later, Mitchell describes how "Scarlett turned her prettiest smile on Ashley, but for some reason he was not looking at her. He was looking at Charles . . ." GWTW at 113. This particular element of Randall's parody takes on special relevance in the market-harm analysis of the case, because it is evident from the record evidence that SunTrust makes a practice of requiring authors of its licensed derivatives to make no references to homosexuality.

In light of this, we find it difficult to conclude that Randall simply tried to "avoid the drudgery in working up something fresh." Campbell, 510 U.S. at 580, 114 S. Ct. at 1172. It is hard to imagine how Randall could have specifically criticized GWTW without depending heavily upon copyrighted elements of that book. A parody is a work that seeks to comment upon or criticize another work by appropriating elements of the original. "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination." Campbell, 510 U.S. at 580-81, 114 S. Ct. at 1172. Thus, Randall has fully employed those conscripted elements from GWTW to make war against it. Her work, TWDG, reflects transformative value because it "can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." Campbell, 510 U.S. at 579, 114 S. Ct. at 1171.

While "transformative use is not absolutely necessary for a finding of fair use, . . . the more transformative the new work, the less will be the significance of other factors." Id., 114 S. Ct. at 1171 (internal citations omitted). In the case of TWDG, consideration of this factor certainly militates in favor of a finding of fair use, and, informs our analysis of the other factors, particularly the fourth, as discussed below .

ii. Nature of the Copyrighted Work

32

The second factor, the nature of the copyrighted work, recognizes that there is a hierarchy of copyright protection in which original, creative works are afforded greater protection than derivative works or factual compilations. Id. at 586, 114 S. Ct. at 1175; Microdos, 115 F.3d at 1515 n.16. GWTW is undoubtedly entitled to the greatest degree of protection as an original work of fiction. This factor is given little weight in parody cases, however, "since parodies almost invariably copy publicly known, expressive works." Campbell, 510 U.S. at 586, 114 S. Ct. at 1175.

iii. Amount and Substantiality of the Portion Used

The third fair-use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." § 107(3). It is at this point that parody presents uniquely difficult problems for courts in the fair-use context, for "[p]arody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. . . . When parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." Campbell, 510 U.S. at 588, 114 S. Ct. at 1176. Once enough has been taken to "conjure up" the original in the minds of the readership, any further taking must specifically serve the new work's parodic aims. Id., 114 S. Ct. at 1176.

GWTW is one of the most famous, popular, and enduring American novels ever written. Given the fame of the work and its primary characters, SunTrust argues that very little reference is required to conjure up GWTW. As we have already indicated in our discussion of substantial similarity, TWDG appropriates a substantial portion of the protected elements of GWTW. Houghton Mifflin argues that TWDG takes nothing from GWTW that does not serve a parodic purpose, the crux of the argument being that a large number of characters had to be taken from GWTW because each represents a different ideal or stereotype that requires commentary, and that the work as a whole could not be adequately commented upon without revisiting substantial portions of the plot, including its most famous scenes. Houghton Mifflin's argument is similar to that made by the defendants in Harper & Row, who argued for "expanding the doctrine of fair use to create what amounts to a public figure exception to copyright." 471 U.S. at 560, 105 S. Ct. at 2230. To the extent Houghton Mifflin argues for extra latitude in copying from GWTW because of its fame, the Supreme Court has squarely foreclosed any such privilege:

> It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public. . . . To propose that fair use be imposed whenever the social value of dissemination outweighs any detriment to the artist, would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it.

34

Id. at 559, 105 S. Ct. at 2229-30 (internal quotations and punctuation omitted).

Notably, however, the Court did not go so far as to grant well-known works a special, higher copyright status either.

There are numerous instances in which TWDG appropriates elements of GWTW and then transforms them for the purpose of commentary. TWDG uses several of GWTW's most famous lines, but vests them with a completely new significance. For example, the final lines of GWTW, "Tomorrow, I'll think of some way to get him back. After all, tomorrow is another day," are transformed in TWDG into "For all those we love for whom tomorrow will not be another day, we send the sweet prayer of resting in peace." Another such recasting is Rhett's famous quip to Scarlett as he left her in GWTW, "My dear, I don't give a damn." In TWDG, the repetition of this line (which is paraphrased) changes the reader's perception of Rhett/R.B.—and of black-white relations—because he has left Scarlett/Other for Cynara, a former slave. Another clear instance in which a memorable scene from GWTW is taken primarily for the purpose of parody is Gerald/Planter's acquisition of Pork/Garlic. In GWTW, Gerald won Pork in a card game with a man from St. Simons Island. In TWDG, Planter wins Garlic in a card game with a man from St. Simons Island, but Garlic, far from being the passive "chattel" in GWTW, is portrayed as being smarter than either white character by

orchestrating the outcome of the card game and determining his own fate. There are many more such transformative uses of elements of GWTW in TWDG.

On the other hand, however, we are told that not all of TWDG's takings from GWTW are clearly justified as commentary. We have already determined that TWDG is a parody, but not every parody is a fair use. SunTrust contends that TWDG, at least at the margins, takes more of the protected elements of GWTW than was necessary to serve a parodic function.

For example, in a sworn declaration to the district court, Randall stated that she needed to reference the scene from GWTW in which Jeems is given to the Tarleton twins as a birthday present because she considers it "perhaps the single most repellent paragraph in Margaret Mitchell's novel: a black child given to two white children as a birthday present . . . as if the buying and selling of children thus had no moral significance." Clearly, such a scene is fair game for criticism. However, in this instance, SunTrust argues that TWDG goes beyond commentary on the occurrence itself, appropriating such nonrelevant details as the fact that the twins had red hair and were killed at Gettysburg. There are several other scenes from GWTW, such as the incident in which Scarlett threw a vase at Ashley while Rhett was hidden on the couch, that are retold or alluded to without serving any apparent parodic purpose. Similar taking of the descriptions of characters and the

36

minor details of their histories and interactions that arguably are not essential to the parodic purpose of the work recur throughout: Melanie/Mealy Mouth is flat-chested, Mammy is described as being like an elephant and is proud of Scarlett/Other's small waist, Gerald/Planter had been run out of Ireland for committing murder and is an excellent horseman, Bonnie/Precious wears a blue velvet riding habit and is afraid of the dark, Belle/Beauty has red hair and lives in Atlanta, Ellen/Lady likes lemon verbena, Carreen/Kareen ends up in a convent in Charleston. Clearly, TWDG uses these idiosyncratic characters. But we must determine whether the use is fair. In doing so, we are reminded that literary relevance is a highly subjective analysis ill-suited for judicial inquiry. Thus we are presented with conflicting and opposing arguments relative to the amount taken and whether it was too much or a necessary amount.

The Supreme Court in Campbell did not require that parodists take the bare minimum amount of copyright material necessary to conjure up the original work. Parody "must be able to conjure up *at least* enough of [the] original to make the object of its critical wit recognizable." Campbell, 510 U.S. at 588, 114 S. Ct. at 1176 (emphasis added; quotations omitted). "Parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. . . . [E]ven more extensive use [than necessary to conjure up the original] would still be

fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary." Elsmere Music, Inc. v. National Broad'g Co., 623 F.2d 252, 253 n. 1 (2d Cir. 1980).

A use does not necessarily become infringing the moment it does more than simply conjure up another work. Rather, "[o]nce enough has been taken to assure identification, how much more is reasonable will depend, say, [1] on the extent to which the [work's] *overriding purpose and character is to parody* the original or, in contrast, [2] the likelihood that the parody may serve as *a market substitute* for the original." Campbell, 510 U.S. at 588, 114 S. Ct. at 1176 (numeration and emphasis added). As to the first point, it is manifest that TWDG's *raison d'etre* is to parody GWTW.[27] The second point indicates that any material we suspect is "extraneous" to the parody is unlawful only if it negatively effects the potential

---

[27] SunTrust suggests that Houghton Mifflin decided–as a legalistic afterthought–to market TWDG as a "parody." We are mindful of Justice Kennedy's admonition that courts "ensure that no just any commercial takeoff is rationalized post hoc as a parody." Campbell, 510 U.S. at 600 (Kennedy, J., concurring). Justice Kennedy's concurrence simply underscores the danger of relying upon facile, formalistic labels, and encourages us to march this alleged infringement through fair use's four-pronged analysis as we would any other such work. Randall and Houghton-Mifflin may label their book a "parody," or a "novel," or whatever they like, and that fact would be largely irrelevant to our task. Defendants "need not label their [work] . . . a parody in order to claim fair use protection . . . Parody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious . . . " Campbell, 510 U.S. at 583 n. 17. The only way in which Houghton Mifflin's marketing strategy might be relevant is if it diverted consumers from GWTW-related products to its own. In any case, such a practice, if it were found to exist, would likely fall under the market harm fair use factor.

38

market for or value of the original copyright. Based upon this record at this juncture, we cannot determine in any conclusive way whether "'the quantity and value of the materials used'" are reasonable in relation to the purpose of the copying.'" Id., 510 U.S. at 586, 114 S. Ct. at 1175 (quoting Folsom, 9 F.Cas. at 348).

### iv. Effect on the Market Value of the Original

The final fair-use factor requires us to consider the effect that the publication of TWDG will have on the market for or value of SunTrust's copyright in GWTW, including the potential harm it may cause to the market for derivative works based on GWTW. Campbell, 510 U.S. at 590, 114 S. Ct. at 1177. In addressing this factor, we must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant [] would result in a substantially adverse impact on the potential market." Id., 114 S. Ct. at 1177 (quotations omitted). More specifically, the Campbell Court continued: "[T]he only harm to derivatives that need concern us . . . is the harm of market substitution. The fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright that the like threat to the original market." Id., 510 U.S. at 593, 114 S.

39

Ct. at 1178.[28]  See also Nimmer on Copyright, § 1305[A][4] at 181 (Vol. 4) (citing

Consumers Union of U.S., Inc. v. General Signal Corp., 724 F.2d 1044 (2nd Cir.

1993)) ("The fourth factor looks to adverse impact only by reason of usurpation of

the demand for plaintiff's work through defendant's copying of protectible

expression from such work.").

As for the potential market, SunTrust proffered evidence in the district court

of the value of its copyright in GWTW.  Several derivative works of GWTW have

been authorized, including the famous movie of the same name and a book titled

Scarlett: The Sequel.[29]  GWTW and the derivative works based upon it have

generated millions of dollars for the copyright holders.  SunTrust has negotiated an

agreement with St. Martin's Press permitting it to produce another derivative work

based on GWTW, a privilege for which St. Martin's paid "well into seven figures."

Part of this agreement was that SunTrust would not authorize any other derivative

works prior to the publication of St. Martin's book.

---

[28] "Whereas a work that merely supplants or supersedes another is likely to cause a substantially adverse impact on the potential market of the original, a transformative work is less likely to do so." Sony Computer Entertainment, Inc. v. Connectix Corp., 203 F.3d 596, 607 (9th Cir. 2000) (citing Campbell, 510 U.S. at 591, 114 S. Ct. at 1177, and Harper & Row Publishers, Inc. v. Nation Enters., Inc., 471 U.S. 539, 567-69 (1985)).

[29] See generally, Trust Co. Bank v. MGM/UA Entertainment Co., 772 F.2d 740 (11th Cir. 1985).

An examination of the record, with its limited development as to relevant market harm due to the preliminary injunction status of the case, discloses that SunTrust focuses on the value of GWTW and its derivatives, but fails to address and offers little evidence or argument to demonstrate that TWDG would supplant demand for SunTrust's licensed derivatives. However, the Supreme Court and other appeals courts have made clear that, particularly in cases of parody, evidence of harm to the potential market for or value of the original copyright is crucial to a fair use determination. "[E]vidence about relevant markets" is also crucial to the fair use analysis. Campbell, 510 U.S. at 590, 114 S. Ct. at 1177. "Evidence of substantial harm to [a derivative market] would weigh against a finding of fair use." Id. at 593, 114 S. Ct. at 1178. "What is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exits." Sony, 464 U.S. at 451, 104 S. Ct. at 793 (emphasis in original).[30] It should also be remembered that with a work as old as GWTW on which the original

---

[30] See also Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1119 (9th Cir. 2000) (noting, in market harm analysis, that "undisputed evidence shows that individuals who received copies of [defendant's work] from [defendant] are present or could be potential adherents of [plaintiff's]"); Liebovitz v. Paramount Pictures Corp., 137 F.3d 109, 116 n. 6 (2nd Cir. 1998) (where plaintiff conceded lack of market harm for derivative works, "defendant had no obligation to present evidence to present evidence showing lack of harm"); Ringgold v. Black Entertainment Television, Inc., 126 F.3d 70, 81 (2nd Cir. 1997) ("[I]n view of what Ringgold has averred is prepared to prove, the record on the fourth fair use factor is inadequate to permit summary judgment for the defendants."); Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1403 (9th Cir. 1997) ) (parties "must bring forward favorable evidence about relevant markets.").

41

copyright may soon expire, creation of a derivative work only serves to protect that which is original to the latter work and does not somehow extend the copyright in the copyrightable elements of the *original* work.  See § 103(b) ("The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply <u>any</u> exclusive right in the preexisting material.").

In contrast, the evidence proffered in support of the fair use defense[31] specifically and correctly focused on market substitution and demonstrates why Randall's book is unlikely to displace sales of <u>GWTW</u>.[32]  Thus, we conclude,

---

[31] "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." <u>Campbell</u>, 510 U.S. at 590, 114 S. Ct. at 1177.  At the injunction stage, the burden remains in the party seeking restraint to demonstrate the likelihood of success on the merits.  Thus, in a copyright infringement case, the copyright owner must demonstrate (after establishing copyright ownership and the taking of *original* elements), where a *prima facie* fair use defense is presented, that the fair use factors are insufficient to support such a defense.  As a practical matter, the fair use proponent will anticipate its burden on the merits and counter with evidence to support its claim of fair use.  That is often why district courts invoke Fed. R. Civ. P. 65(a)(2) to consolidate the trials of the action on the merits with the hearing on the application for preliminary injunction.  The record in this case reflects that such a consolidation was not accomplished.

[32] It is worth noting that in the several months since we lifted the injunction against publication of <u>TWDG</u> there have been sales of both <u>GWTW</u> and <u>TWDG</u> which may assist the district court in evaluating the economic harm fair use factor.  The Court in <u>Campbell</u> did acknowledge that "[e]ven favorable evidence, without more, is no guarantee of fairness," and that the market harm factor, "no less than the other three, may be addressed only through a 'sensitive balancing of interests'" 510 U.S. at 590, n. 21, 114 S. Ct. at 1177, n. 21 (quoting <u>Sony Corp.</u>, 464. U.S. at 455, n. 40, 104 S. Ct. 795, n. 40).  That the market harm factor may not always be a purely factual or evidentiary matter, however, does not mean that it is a purely legal matter.  It is, like fair use generally, a mixed question of law and fact.

42

based on the current record, that SunTrust's evidence falls far short of establishing that <u>TWDG</u> or others like it will act as market substitutes for <u>GWTW</u> or will significantly harm its derivatives.  Accordingly, the fourth fair use factor weighs in favor of <u>TWDG</u>.

        c.  Summary of the Merits

We reject the district court's conclusion that SunTrust has established its likelihood of success on the merits.  To the contrary, based upon our analysis of the fair use factors we find, at this juncture, <u>TWDG</u> is entitled to a fair-use defense.

    2.  <u>Irreparable Injury</u>

The district court found that the second factor in the preliminary injunction analysis, irreparable injury to SunTrust, could be presumed following a showing of copyright infringement.  <u>SunTrust</u>, 136 F.Supp.2d at 1384 (citing <u>Sony Corp.</u>, 464 U.S. at 451-52, 104 S. Ct. at 793).  As we have previously indicated, however, the Supreme Court has made clear that there is no presumption of irreparable injury when the alleged infringer has a bona fide fair-use defense.  <u>Campbell</u>, 510 U.S. at 578 n.10, 114 S. Ct. at 1171 n.10.

In evaluating irreparable injury we consider only the potential harm that the copyright holders of <u>GWTW</u> will suffer from the publication of <u>TWDG</u> itself. SunTrust argues that it has "incalculable millions of dollars riding on the

43

appropriate cultivation of the [GWTW] franchise," but it has failed to show, at least at this early juncture in the case, how the publication of TWDG, a work that may have little to no appeal to the fans of GWTW who comprise the logical market for its authorized derivative works, will cause it irreparable injury.  To the extent that SunTrust will suffer monetary harm from the infringement of its copyright, harms that may be remedied through the award of monetary damages are not considered "irreparable." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987).

Thus, a lack of irreparable injury to SunTrust, together with the First Amendment concerns regarding comment and criticism and the likelihood that a fair use defense will prevail, make injunctive relief improper  and we need not address the remaining factors, except to stress that the public interest is always served in promoting First Amendment values and in preserving the public domain from encroachment.  Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000). Accordingly, we vacate the district court's injunction.  We thereby substitute this opinion for our brief order issued on 25 May 2001, reported at 252 F.3d 1165 (11th Cir. 2001).

## III.  CONCLUSION

44

SunTrust initiated this action as one alleging copyright infringement and seeking monetary damages. SunTrust subsequently moved for a preliminary injunction to stay the publication of TWDG, which the district court granted. In granting the injunction, however, the district court incorrectly assessed the issues of "likelihood of success on the merits" and "irreparable harm" as discussed above. The Supreme Court has recognized that "the goals of copyright law, to stimulate the creation and publication of edifying matter, are not always best served by automatically granting injunctive relief when parodists are found to have gone beyond the bounds of fair use." Campbell, 510 U.S. at 578 n.10, 114 S. Ct. at 1171 n.10 (quotations omitted). The Court cited to an article by Judge Pierre Leval of the Second Circuit, in which he notes that injunctive relief is appropriate in "the vast majority of [copyright] cases" because "the infringements are simple piracy," but cautions that such cases are "worlds apart from many of those raising reasonable contentions of fair use where there may be a strong public interest in the publication of the secondary work and the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found." Id. (quoting Leval, Toward a Fair Use Standard, 103 HARV. L. REV. 1105, 1132 (1990)) (internal punctuation omitted).

In this case, we have found that to the extent SunTrust suffers injury from TWDG's putative infringement of its copyright in GWTW, such harm can adequately be remedied through an award of monetary damages. Moreover, under the present state of the record, it appears that a viable fair use defense is available. Thus, the issuance of the injunction was at odds with the shared principles of the First Amendment and the copyright law, acting as a prior restraint on speech because the public had not had access to Randall's ideas or viewpoint in the form of expression that she chose.

We **VACATE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

MARCUS, Circuit Judge, specially concurring:

I concur in Judge Birch's thoughtful and thorough opinion but write separately to emphasize that, on this limited record, SunTrust has fallen well short of establishing a likelihood of success on its copyright infringement claim.  I stress three  points.  First, the district court erred by finding that the critical or parodic element of The Wind Done Gone is anything but clear-cut.  Far from amounting to "unabated piracy," 136 F.Supp.2d 1357, 1369 (N.D. Ga. 2001), The Wind Done Gone is unequivocally parody, as both Judge Birch and the Supreme Court in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), define that term.  Indeed, the book is critical by constitution, its main aim being to shatter Gone With the Wind's window on life in the antebellum and Civil War South.  Second, in service of this parodic design, Randall radically reshapes what she borrows from Mitchell.  I  would thus go even further than Judge Birch in underscoring the transformative nature of Randall's book; the "purpose and nature" prong of the fair use analysis is not a close call, in my view.  Third, the preliminary record, if anything, suggests that The Wind Done Gone will not act as a substitute for Mitchell's original.  What little evidence we have before us indicates that these two books aim at different readerships; to the extent that there is any overlap between these respective markets, further factfinding may well reveal that these two books

will act as complements rather than substitutes. Moreover, the Mitchell estate

seems to have made a specific practice of refusing to license just the sort of

derivative use Randall has undertaken -- a factor that further undermines

SunTrust's copyright claim.

"'Parodies and caricatures . . . are the most penetrating of criticisms.'"

Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 972 (10th

Cir. 1996) (quoting Aldous Huxley, Point Counter Point, ch. 13 (1928)).[1] Parody

has "long enjoyed a secure niche in the critical tradition, from Aristophanes'

parodies of Aeschylus and Euripides to current lampoons of popular cartoon

characters." II Paul Goldstein, Copyright § 10.2.1.2 (2001). As such, parody is "a

vital commodity in the marketplace of ideas," Cardtoons, 95 F.3d at 972, that

deserves "substantial freedom -- both as entertainment and as a form of social and

literary criticism," Berlin v. E. C. Pubs., Inc., 329 F.2d 541, 545 (2d Cir. 1964).

When rendered in harmony with copyright law, parody enjoys "significant value as

free speech under the First Amendment." Dr. Seuss Enterprises, L.P. v. Penguin

Books USA, Inc., 109 F.3d 1394, 1400 (9th Cir. 1997).

---

[1]Ernest Hemingway did not share Huxley's enthusiasm for the form: "The parody is the last refuge of the frustrated writer. Parodies are what you write when you are associate editor of the Harvard Lampoon. The greater the work of literature, the easier the parody. The step up from writing parodies is writing on the wall above the urinal." Paul Hirshson, "Names and Faces," The Boston Globe, July 22, 1989 at 7. Whatever parody's aesthetic value, copyright law has tended to agree with Huxley as to its social utility.

The Wind Done Gone's critical nature is clearer than that of other works courts have found to be protected parodies. This case does not involve a pop song that simply "comment[s] on the naiveté of the original of an earlier day." Campbell, 510 U.S. at 583; see also Fisher v. Dees, 794 F.2d 432, 434 (9th Cir. 1986) (song entitled "When Sonny Sniffs Glue" was protected parody of "When Sunny Gets Blue"); Elsmere Music, Inc. v. National Broadcasting Co., Inc., 482 F.Supp. 741, 747 (S.D.N.Y.), aff'd, 623 F.2d 252 (2d Cir. 1980) (comedy sketch including song, "I Love Sodom," was protected parody of advertising jingle, "I Love New York"). It does not involve an advertisement in which an actor apes a starlet's pose on a magazine cover. See Leibovitz v. Paramount Pictures Corp., 137 F.3d 109, 115 (2d Cir. 1998) ("'[A] ridiculous image of a smirking, foolish-looking pregnant'" Leslie Nielsen was a protected parody of a "'serious portrayal of a beautiful woman [Demi Moore] taking great pride in the majesty of her pregnant body.'").

Rather, we deal here with a book that seeks to rebut a classic novel's particular perspective on the Civil War and slavery.[2] This fact does not, of course, mean that we ought to grant Randall and Houghton Mifflin any special deference

---

[2] I need not expand upon Judge Birch's excellent explanation of the specific ways in which The Wind Done Gone criticizes or comments on aspects and characters of Gone With the Wind.

in making a fair use determination; the copyright laws apply equally to all expressive content, whether we might deem it of trifling import or utmost gravity. Cf. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke."). The two books' shared subject matter simply helps demonstrate how The Wind Done Gone's critical character is more pronounced than many protected parodies. Our analysis might have been different had we faced a conflict between two literary worldviews of less perfect polarity, for example, or two works that differed over a matter of less sharp controversy. As Judge Birch explains in detail, though, The Wind Done Gone's plain object is to make war on Gone with the Wind's specific outlook -- on a topic that itself tends to elicit no small comment and criticism.

In light of this, Appellee SunTrust's forecasts of a seismic shift in the publishing industry are premature and unfounded. First, our decision today does no more than explain our rationale for overturning the district court's grant of a preliminary injunction; while I am skeptical, for the reasons I explain here, that

50

SunTrust will prevail below, I remind the parties that a full trial on the merits has yet to occur. Second, this opinion will not somehow compel courts to grant the fair use defense to every book that retells a copyrighted story from another character's point of view. Fair use adjudication requires case-by-case analysis and eschews bright-line rules. See Campbell, 510 U.S. at 577. After this case, as before it, only those works whose "parodic character may reasonably be perceived" and that survive the four-prong fair use analysis will be protected as parody. Id. at 582. Had Randall chosen to write The Wind Done Gone from the point of view of one of Mitchell's original characters, for example, and done no more than put a new gloss on the familiar tale without criticizing or commenting on its fundamental theme and spirit, Houghton Mifflin's case would have been much tougher.[3]

The Wind Done Gone's criticism of Gone With the Wind's substance is plain, but whether it parodies Mitchell's style is less clear. This does not weigh

---

[3] It is hazardous to speculate too much about the legality of various hypothetical parodies, given the many forms literary parody may take, and the levels of sophistication it may reach. See Margaret A. Rose, Parody: Ancient, Modern, and Post-Modern 36-38 (1993) (describing an array of parodic literary techniques and "signals"). The irony and self-awareness common in contemporary literature, in particular, may one day pose difficulties for the fair use doctrine. It is not hard to imagine a copyrighted story that parodies itself by design, or an author who makes a career out of parodying his own work in each subsequent one. (Vladimir Nabokov, among others, hinted at the potential for such practices. See, e.g., Vladimir Nabokov, Pale Fire (1962) (a novel consisting of a poem and substantial prose commentary on that poem).) Suppose that this hypothetical author in turn becomes the target of parody by another. Could the second author's work be said to usurp demand for the original author's self-parody? Here, we face a much simpler problem: Gone With the Wind lacks any apparent self-directed irony, and Randall's attack on it is just as straight-forward.

against Houghton Mifflin's parody defense, however, because a work need only exhibit "critical bearing on the substance <u>or</u> style of the original composition." <u>Campbell</u>, 510 U.S. at 580 (emphasis added). In any event, Randall's style is a marked departure from Mitchell's. <u>The Wind Done Gone</u> takes diary form; its chronology is disjunctive and its language often earthy. It is told from an introspective first-person point of view. Mitchell's story, by comparison, is a linear third-person narrative, epic in scope and staid in tone. Perhaps Randall based her story on the perceptions of a single character to underscore the inherent subjectivity of storytelling, in contrast to Mitchell's disembodied, "objective" narrator. To whatever extent it parodies Mitchell's authorial voice, Randall's narrative style furthers her <u>overall</u> parodic purpose by reinforcing the notion that <u>The Wind Done Gone</u> casts <u>Gone With the Wind</u>'s story and characters in a new, and contrary, light.

The district court recognized that "the two works . . . present polar viewpoints," yet concluded that <u>The Wind Done Gone</u> recreates "the same fictional world, described in the same way and inhabited by the same people, who are doing the same things." 136 F.Supp.2d at 1369. Of course, both works are set in the antebellum South, but <u>The Wind Done Gone</u> creates an alter universe described in a wholly different style, and inhabited by shrewd slaves who manipulate

52

incompetent masters and free blacks who thrive independent of the white plantation system. Like a political, thematic, and stylistic negative, The Wind Done Gone inverts Gone With the Wind's portrait of race relations of the place and era.

Given this stark contrast, I would go further than Judge Birch in stressing the transformative nature of Randall's book. I agree with, and therefore will not echo, Judge Birch's analysis of the specific transformative uses Randall makes of elements of Gone With the Wind. I arrive, however, at a less qualified conclusion on the matter. Far from being "a double-edged sword" that only "militates in favor of a finding of fair use," the issue of transformation cuts decisively in Houghton Mifflin's favor, in my view. Even a cursory comparison of the two texts reveals that The Wind Done Gone profoundly alters what it borrows -- indeed, at times beyond recognition. To catch some of Randall's allusions, even a reader familiar with Mitchell's work may need to refer to the original text. To create a successful parody, an author must keep certain elements constant while inverting or exaggerating other variables; "[g]enerally there is an incongruity between the borrowed and the new elements." Richard A. Posner, When Is Parody Fair Use? 21 J. Leg. Stud. 67, 68 (1992). In Randall's book, the ratio of the former to the latter is very low, and the incongruity between them wide.

Next, it is worth emphasizing that the limited record at this preliminary stage in no way supports the district court's finding that The Wind Done Gone might act as a market substitute for Gone with the Wind or its licensed derivatives. Turning to the affidavits submitted on behalf of Houghton Mifflin, one expert said that "The Wind Done Gone is unlikely to have any discernible effect on the market for sequels other than, possibly, through its criticism. . . . Audience members with a deep affection for Gone with the Wind are unlikely to be drawn to The Wind Done Gone, . . . [which] appeals to a distinctly contemporary sensibility for fresh, irreverent, realistic works of fiction that turn old ideas upside down." Another testified that The Wind Done Gone "will not appeal to any desire among readers for a sequel to Gone With the Wind . . . [because] [t]he target audiences for the two books are . . . very different."

SunTrust's evidence for the contrary view is likewise incomplete. Experts submitted affidavits stating that The Wind Done Gone is a "parasitical work [that] has little merit [and] . . . exist[s] solely to exploit Gone With the Wind," and that Randall's book would "seriously taint the original." One expert stressed "the need of the representatives of Margaret Mitchell's Gone With the Wind to protect the reputation" of their copyright. Another said that The Wind Done Gone will "capitalize on and thus benefit from the resulting notoriety that will accrue to it as

54

the reading public makes the inevitable comparison to Gone With the Wind which has become and remains a popular classic since its publication." Still others reminded the district court that SunTrust has inked multi-million dollar deals for its licensed derivatives.

None of these statements provides any explanation or data regarding how Randall's book or others like it would act as substitutes for Gone With the Wind derivatives. "Capitaliz[ing]" on or "benefit[ting] from . . . [a book's] notoriety" does not always amount to harmful substitution; if it did, no commercial parody, which by definition seeks to profit from another work's notoriety by mocking it, would be permitted. See Campbell, 510 U.S. at 584 (rejecting the notion that commercial uses are presumed unfair).

Furthermore, it is not copyright's job to "protect the reputation" of a work or guard it from "taint" in any sense except an economic one -- specifically, where substitution occurs. See Campbell, 510 U.S. at 592 (describing the "distinction between potentially remediable displacement and unremediable disparagement"); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 (1977) ("[T]he goals of patent and copyright law . . . focus[] on the right of the individual to reap the reward of his endeavors and hav[e] little to do with protecting feelings or reputation."); Arnstein v. Porter, 154 F.2d 464, 473 (2d Cir. 1946) (stating that a

55

copyright holder's "legally protected interest is not, as such, his reputation as a musician but his interest in the potential financial returns from his compositions which derive from the lay public's approbation of his efforts"); cf. Fisher, 794 F.2d at 440 (rejecting a copyright holder's claims of "defamation and disparagement" in the context of a parodic fair use). Since Randall's book seeks to upend Mitchell's view of the antebellum South, there is no great risk that readers will confuse it for part of Gone With the Wind's "ongoing saga." No one disputes that SunTrust's derivative rights are worth millions, but that fact tells nothing of how an anti-Gone With the Wind screed would act as a market substitute.

On remand, I believe the district court should remain mindful that "market harm" cannot be established simply by a showing that the original's sales have suffered or may do so. Rather, the market harm factor requires proof that The Wind Done Gone has usurped demand for Gone With the Wind, see Campbell, 510 U.S. at 592, or that widespread conduct of the sort engaged in by Randall[4] would harm SunTrust's derivative markets, see id. at 590. "[I]f the secondary work harms

_____

[4]The fourth fair use factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." Campbell, 510 U.S. at 590 (citation omitted). Here, "conduct of the sort engaged in by the defendant" would include only those parodies that make a similar frontal attack on Gone With the Wind and that, like Randall's book, radically transform elements borrowed from the original.

the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, 'it does not produce a harm cognizable under the Copyright Act.'" On Davis v. The Gap, Inc., 246 F.3d 152, 175 (2d Cir. 2001) (quoting Campbell, 510 U.S. at 592). "[T]he role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps [the market for the original]." Campbell, 510 U.S. at 592 (internal quotation marks omitted) (brackets omitted). In cases where it is "difficult to determine whence the harm flows . . . the other fair use factors may provide some indicia of the likely source of the harm. A work whose overriding purpose and character is parodic and whose borrowing is slight in relation to its parody will be far less likely to cause cognizable harm than a work with little parodic content and much copying." Id. at 593 n.24.

It is even possible that The Wind Done Gone will act as a complement to, rather than a substitute for, Gone With the Wind and its potential derivatives. Readers of Randall's book may want to refresh their recollections of the original.[5] It is not far-fetched to predict that sales of Gone With the Wind have grown since

---

[5]As Jane Chelius attested: "It is easier to imagine a buyer of The Wind Done Gone wanting to read Gone With the Wind to find a reference point, than it is to imagine a reader who loved Gone With the Wind wanting to read a book such as The Wind Done Gone that parodies and puts it in a critical light."

The Wind Done Gone's publication. A more fully developed record on the subject will no doubt aid the district court's analysis.

Finally, I wish to highlight a factor significant to the market harm inquiry: SunTrust's apparent practice of placing certain editorial restrictions on the authors of its licensed derivatives.  Pat Conroy, the author of The Prince of Tides and Beach Music, among other novels, attested to the sorts of constraints the Mitchell estate sought to place on him as a potential author of a sequel to Gone With the Wind:

> I wrote an introduction to the sixtieth anniversary edition of [Gone With the Wind] . . . After the appearance of my introduction[,] which included my own deep appreciation for the artistry of GWTW, the estate of Margaret Mitchell contacted my agent, Julian Bach, in New York and asked if I would be interested in doing a sequel to GWTW. . . . When Julian Bach called me, he issued a strange decree from the estate that Julian said was non-negotiable. . . .  He said, "You're not going to like this, but the estate will require you to sign a pledge that says you will under no circumstances write anything about miscegenation or homosexuality."[6]

---

[6]In a piece of documentary evidence submitted by SunTrust (Thomas Hal Clarke, attorney and member of the committee established by the trust instruments to direct the plaintiff SunTrust Bank), Conroy again indicates that the Mitchell Estate was loath to license a derivative work that contained such elements:

> All my resistance to your restrictions — all of them, and I include miscegenation, homosexuality, the rights of review and approval — I do because they begin inching toward the precincts of censorship.

Fax to Owen Laster from Pat Conroy, Nov. 10, 1998.

In light of this, the The Wind Done Gone's transformation of Ashley Wilkes into a homosexual, its depiction of interracial sex, and its multiple mulatto characters take on additional relevance. The Supreme Court in Campbell explained how a copyright holder's reluctance to license certain kinds of derivatives affects the market harm analysis:

> The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.

510 U.S. at 592.

Other courts have echoed the principle that "'only traditional, reasonable, or likely to be developed markets'" ought to be considered when assessing the effect of a challenged use upon a potential market. Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 81 (2d Cir. 1997) (citation omitted); see also Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 25 (1st Cir. 2000); Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 111 (2d Cir. 1998). "In the cases where we have found the fourth factor to favor a defendant, the defendant's work filled a market niche that the plaintiff simply had no interest in occupying." Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1377 (2d Cir. 1993).

59

The preliminary record does not indicate why SunTrust sought to impose editorial restrictions on Conroy. To the extent that SunTrust may have done so to preserve Gone With the Wind's reputation, or protect its story from "taint," however, it may not now invoke copyright to further that goal. Of course, SunTrust can choose to license its derivatives however it wishes and insist that those derivatives remain free of content it deems disreputable. SunTrust may be vigilant of Gone With the Wind's public image -- but it may not use copyright to shield Gone With the Wind from unwelcome comment, a policy that would extend intellectual property protection "into the precincts of censorship," in Pat Conroy's words. "Because the social good is served by increasing the supply of criticism -- and thus, potentially, of truth -- creators of original works cannot be given the power to block the dissemination of critical derivative works." Leibovitz, 137 F.3d at 115 n.3. "Copyright law is not designed to stifle critics. Destructive parodies play an important role in social and literary criticism and thus merit protection even though they may discourage or discredit an original author." Fisher, 794 F.2d at 438 (citation and internal quotation marks omitted).

The law grants copyright holders a powerful monopoly in their expressive works. It should not also afford them windfall damages for the publication of the

sorts of works that they themselves would never publish, or worse, grant them a power of indirect censorship.

Finally, Appellee warns that our decision in this case will prompt an endless parade of litigants to test the boundaries of the rule we establish here. This is at least possible, but such a phenomenon is not exactly alien to our common law tradition. And to the extent authors and publishers will be encouraged to experiment with new and different forms of storytelling, copyright's fundamental purpose, "[t]o promote the Progress of Science and useful Arts," will have been served. U.S. Const. Art. 1, § 8, cl. 8.