**CCA AND B, LLC, Plaintiff,**

**v.**

**F + W MEDIA INC., Defendant.**

**Civil Action No. 1:11–CV–2056.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 22, 2011.

Christopher Mingledorff, Moore Ingram Johnson & Steele, LLP, for Plaintiffs.

Glenn D. Bellamy and Stephen E. Gillen, Wood Herron & Evans; Ashish D. Patel, Thompson Hine LLP–GA, for Defendant.

### *ORDER*

AMY TOTENBERG, District Judge.

The motion now before the Court calls to mind the old adage, "You can't judge a book by its cover." This time-worn advice instructs us to give more attention to the substance of a work than its shiny packaging. However, the Court's ruling on the instant motion turns on whether in the madness of holiday shopping it is likely that the average consumer of Plaintiff's book, possibly giddy from gingerbread lattes and twenty-four-hour canned holiday jingles, will be confused by the similarity of the book covers of *The Elf on the Shelf* and Defendant's purported parody, *The Elf off the Shelf.* Because Plaintiff has not met its burden of showing a substantial likelihood of such consumer confusion or successfully refuted Defendant's fair use defense to copyright infringement, the Court **DENIES** Plaintiff's motion for preliminary injunction [Doc. 2].

### I. PROCEDURAL BACKGROUND

On June 24, 2011, Plaintiff CCA and B, LLC ("CCA and B" or "Plaintiff") filed its complaint in this action, along with a Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 2]. Plaintiff seeks an Order enjoining Defendant F + W Media, Inc. ("F + W Media" or "Defendant")[1] from publishing, producing, marketing and selling Defendant's publication, *The Elf off the Shelf,* until a trial on the merits of Plaintiff's claims has been conducted. The complaint presents claims for federal trademark infringement, copyright infringement, trademark dilution, and violation of the Anti–Cyber Squatting Consumer Protection Act; state unfair competition, deceptive trade practices, and false advertising; and common law trademark infringement and unfair competition. In its brief and oral argument supporting its motion for preliminary injunction, Plaintiff argued that it had a substantial likelihood of success on only the trademark and copyright infringement claims. (Pl.'s Br. Supp. Mot.) This order therefore considers only those claims.

The Court held a hearing on the motion on August 24, 2011. The parties put on no witnesses at the hearing; the only evidence admitted was a packet of website screen shots. Plaintiff notably failed to put forth evidence of consumer confusion about the two products or irreparable harm beyond the exhibits attached to the parties' briefs. The Court therefore decides the instant motion based on consideration of all relevant pleadings and papers filed by the parties, the web screen shots admitted at the hearing, the original publications of both books, and oral argument.

### II. FACTUAL BACKGROUND

Plaintiff's publication *The Elf on the Shelf ("Elf On")* is a popular children's

---

1. The parties filed a joint stipulation of dismissal without prejudice of Defendants O'Neill, Gissinger, and Faria on August 11, 2011. (Doc. 34.) On September 16, 2011, the parties filed a stipulation of dismissal of Adams Media, Inc. (Doc. 42.), a sub-division of Defendant F + W Media, Inc. Accordingly, F + W Media, Inc. is now the sole defendant in this matter.

Christmas book sold in a 10″ by 10″ by 2.5″ box set with a plush toy elf doll 8.5 inches in height in a red costume.[2] Since *Elf On* hit the shelves in 2005, Plaintiff claims it has sold more than 1.5 million copies. (Pl.'s Br. Supp. Mot. at 2.) Plaintiff owns registered copyrights in the elf doll and an image of an elf in a red Santa-like costume sitting on the shelf (the "sitting elf" image), which graces the cover. (Compl. Exs. B, C.) Plaintiff owns registered trademarks in the word mark "The Elf on the Shelf," the stylized logo used on the cover of its book, and the sitting elf image. (Compl. Exs. D, E, F.) Plaintiff also currently uses the domain name www. elfontheshelf.com to promote its book.

The story in *Elf On* explains how Santa keeps track of who's naughty and nice each year and what are their wishes: by employing millions of "scout" elves around the world to monitor children's behavior. (Compl. Ex. A.) These friendly elves are dispatched to individual families to watch the children's behavior and report nightly back to Santa. (*Id.*) The story warns children that the elf will report every "push or a shove" or broken rule, but reassures that "small acts of kindness will not be a loss." (*Id.*) The elf encourages children to tell him their every gift desire so he can report their lists to Santa. (*Id.*)

Parents who wish to bring the story to life can participate by moving the elf around the house for children to find each day as evidence that the elf returns to the North Pole at night to tell Santa about their behavior. (*See id.*) The book jacket informs readers the author discovered an "unwitting" benefit of this "tradition": "it helped the children to better control themselves. All it took was a gentle reminder that 'the elf is watching,' for errant behavior to be modified." (*Elf On.*)

The book is illustrated with subdued watercolor paintings that resemble the world of a child's imagination more than that of reality. (Compl. Ex. A.) The cover includes the stylized logo of the word mark and the sitting elf logo mark, along with the subtitle "A Christmas Tradition" and a byline identifying the authors and illustrator. (*Id.* at 1.) The book and doll set is available at major book retailers including Amazon.com. (Pl.'s Br. Supp. Mot. at 7.)

Early in 2011, Plaintiff got wind of Defendant's publication, *The Elf Off the Shelf* ("*Elf Off*"). (Pl.'s Br. Supp. Mot. at 5.) Plaintiff claims Defendant's work infringes on its copyrights and trademarks. (*Id.*) Defendant argues that *Elf Off* is a noninfringing parody of Plaintiff's book. (Defs.' Mem. Opp'n Mot.)

*Elf Off* tells a very different but related story. The elf narrator describes himself as a discount elf (sprung from a marked-down copy of *Elf On*) who is supposed to help Santa decide who's been naughty and nice. (Compl. Ex. H.) But the stories quickly diverge from this common ground. In *Elf Off*, the elf warns that he'll be "pissed" if children give him a name he dislikes. (*Id.* at 6.) Once he's given a lousy first name, Horace the Elf decides he's not going to be a good elf. Rather, he's going to drink spiked eggnog, try to make his "move" on Barbie while Ken's away at the Malibu dream house, watch pornography in the middle of the night, change the children's gift list so there's "something in it for me," and finally, run away to the tropics rather than return to the North Pole. (*Id.*)

The book jacket tells readers Horace decided to accept the "shelf gig" because it was a chance to leave his parents' base-

---

**2.** The parties submitted their respective publications for the Court to review. The Court cites the books directly when the photocopies of the books submitted as exhibits do not show the relevant details.

ment for the first time in two hundred and sixty seven years. Prior to "being sent out to spy on and judge small children, he worked the assembly line in Santa's Workshop." (*Id.*)

Defendant's book cover includes the book title in a font that is quite similar to Plaintiff's stylized logo font, an image of an elf in a green costume dangling from a shelf, the subtitle "A Christmas Tradition Gone Bad," a byline attributing the story to Horace the Elf, and a final sentence, in red font: "A new holiday **parody**—for Mom and Dad!"[3] (*Id.;* emphasis in original.) The book is also 10″ by 10″ by .25″— much thinner than Plaintiff's box set. (*Id.*) *Elf Off* is not sold with a doll or special packaging. (*Id.*) The back cover shows a photograph of the elf doll holding the *Elf On* book while surrounded by a remote control, *Zombie Slayer* DVD, and various gift cards. (*Id.*) The back cover includes a small-print disclaimer that the book is a parody and was not "prepared, approved, or authorized" by the makers of *Elf On.* The copyright page includes a similar disclaimer of association with *Elf On.* (*Id.*)

Defendant illustrated its book with photographs of Plaintiff's elf doll, but in a green rather than red costume. (*Id.*) Photographs show the elf splayed on a table with spilled eggnog, snuggled in bed with Barbie, hanging out in the Christmas tree with a nutcracker, and lying behind a toilet after being tormented by the cat. (Compl. Ex. H.) The first page of the *Elf Off* story shows a small picture of Plaintiff's book, including the sitting elf image, partially obscured by "75% off" and "super markdown" stickers. (*Id.*)

Defendant has listed its book for presale with major online retailers including both Barnes and Noble and Amazon.com. It has also created a website promoting the book at www.elfofftheshelf.com. F + W Media projects more than $167,000 in profits from sales of its book. (Defs.' Mem. Opp'n Mot. Ex. B at 2.)

In its brief, Plaintiff argued that Defendant's book attacks and undermines *Elf On's* "wholesome and healthy" image and seeks merely to capitalize on the brand recognition *Elf On* commands among likely consumers. (Pl.'s Br. Supp. Mot. at 6.) Plaintiff cited an article in *Publisher's Weekly* that reported that *Elf Off* is intended to "knock a holiday favorite off its perch." (*Id.*) Defendant agrees that is precisely their goal, but says there is nothing naughty about it. (Defs.' Mem. Opp'n Mot. at 3.) At oral argument, Plaintiff primarily argued that Defendant's book is not in fact a parody and therefore Defendant's use of Plaintiff's properties is actionable copyright and trademark infringement.

Plaintiff put on no witnesses at the hearing, relying entirely on the books' covers to support its argument that *Elf Off* infringes its copyrights and creates a likelihood of consumer confusion. Defendant contends its work is a parody and therefore protected by the fair use safe harbor in copyright law and not likely to confuse as required for proof of trademark infringement.

For ease of reference, the table below summarizes the intellectual properties and alleged infringements at issue in this case:

| Plaintiff's Property | Defendant's Allegedly Infringing Uses |
| --- | --- |
| Copyright in Elf Doll | Photographs of Elf Doll |
| Copyright in Sitting Elf Image | Dangling Elf Image and Photographs of Plaintiff's Book |
| Trademark in Phrase "The Elf on the Shelf" | Book Title "The Elf off the Shelf" and Domain Name www.elfofftheshelf.com |
| Trademark in Stylized Word Mark on Cover | Similar Style Words on Cover |
| Trademark in Sitting Elf Image | Dangling Elf Image |

**A.**

---

**3.** Images of the front covers of both books are attached at the end of this opinion in Exhibit

## III. DISCUSSION

### A. Requirements for a Preliminary Injunction

■ Before a court will grant a motion for a preliminary injunction, the moving party must establish that: (1) "it has a substantial likelihood of success on the merits," (2) it will suffer irreparable injury if the relief is not granted, (3) the threatened injury outweighs the harm the relief may inflict on the non-moving party, and (4) entry of relief "would not be adverse to the public interest." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir.2006). The plaintiff's likelihood of success on the merits is the most important of the four factors because if plaintiff is unable to make such a showing, the other requirements need not be considered. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir.2011) (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir.2001)).

■ The Court is only authorized to grant the extreme relief of a preliminary injunction when the high standards for such relief have been met. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites.") (citations omitted). Furthermore, the Court must exercise caution when asked to enjoin a publication where the defendant presents a "colorable fair use defense." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir.2001) (citing *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578 n. 10, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)).

### B. Analysis of Likelihood of Success on the Merits

#### 1. Is *Elf off the Shelf* a Parody?

Because the parties dispute whether Defendant's work is a parody, the first question for the Court to address is whether the work is a parody under copyright and trademark standards. The inquiries are similar, but not identical. In copyright, the Court must answer whether the allegedly infringing use makes some form of comment or critique of the original. In trademark, the Court considers whether the defendant's use of the trademark is clearly in jest and therefore is less likely to cause consumer confusion. In both areas, how the Court resolves the question affects the infringement analysis.

##### a. Copyright Parody Issues

■ Parody is a legally recognized and sanctioned form of "fair use" of an original copyrighted work. *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. A work is a parody for purposes of copyright analysis "if its aim is to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to scholarly or journalistic, work." *Suntrust*, 268 F.3d at 1268–69. In creating a parody, the parodies inevitably borrows portions of the copyrighted work in order to evoke the work for purposes of comment or critique. *Campbell*, 510 U.S. at 580–81, 114 S.Ct. 1164.

■ Following this standard, this Court concludes the parody in *Elf Off* is clear, albeit not particularly pungent. The question is simply whether a parody may reasonably be perceived in the content. *Campbell*, 510 U.S. at 582, 114 S.Ct. 1164. *Elf Off* borrows *Elf On's* elf-spy idea to tell the story of a very naughty elf with little interest in monitoring children's behavior. (Compl. Ex. G at 12.) *Elf Off* may not render a scathing critique of Plaintiff's book, but by reporting his own mischief throughout the story, Horace highlights the perceived absurdity of a "big brother" type of elf reporting on small children in *Elf On*. The odd realism in *Elf Off* (with images, including the unflattering photo-

graph of the elf doll lying next to a toilet, suggestive of an under-employed adult living with his parents) contrasts with the wonderland world of *Elf On* in a way that makes the idea of using an Elf "scout" (or spy) to encourage good behavior in one's children seem somehow unsavory. Horace is not hilarious, but he does use his foul mouth to say something pointedly different than the elf in Plaintiff's work.

Plaintiff has not, however, challenged Defendant's entire book as a copyright infringement of the story in *Elf On*. The copyright claims instead charge Defendant with infringement of the elf doll and sitting elf image copyrights, which are merely components of Plaintiff's work. This distinction is relevant in the overall copyright infringement analysis, but does not alter the Court's finding that Defendant's use of Plaintiff's copyrighted elements is in the context of a parody.

. The Court must discern whether *Elf Off* manifests any comment or criticism upon the copyrighted work in the allegedly infringing use. *See Campbell,* 510 U.S. at 583, 114 S.Ct. 1164. While the images and story of *Elf Off* may hardly rise to the level of Lewis Carroll's *Alice in Wonderland,*[4] they nevertheless clearly constitute parody.

**b. Trademark Parody Issues**

■■■■ For the purposes of trademark analysis, "a parody is defined as a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *People for the Ethical Treatment of Animals v. Doughney ("PETA"),* 263 F.3d 359, 366 (4th Cir. 2001). To be considered successful, the alleged parody must both call to mind and differentiate itself from the original, and it must "communicate some articulable element of satire, ridicule, joking or amuse-

ment." *Smith v. Wal–Mart Stores, Inc.,* 537 F.Supp.2d 1302, 1316 (N.D.Ga.2008) (finding that multiple uses of Wal–Mart trademarks for parody did not infringe the trademarks when they presented an obvious critical commentary). The Court's analysis of trademark infringement factors shifts when considering a parody.

■■■■ Defendant appears to have made distinctions between the marks on Plaintiff's work and its own that are most clear upon a side-by-side comparison of the book covers, although this may not be how consumers are likely to view the products. Defendant used a nearly identical font and design to create a cover so similar to Plaintiff's that the consumer may not *immediately* identify Defendant's as a parody. The image of the elf dangling off the shelf rather than sitting on it is a subtle alteration of the image of the elf sitting on the shelf on Plaintiff's book cover. The boldface use of "off" rather than "on" in the title of *Elf Off* is somewhat more noticeable, but still a modest alteration of Plaintiff's overall cover. The use of green, mustard, and blue colors in the main titles on the cover of the *Elf Off* as opposed to the red, orange, and blue colors used by Plaintiff is a very minor distinguishing feature. However, other sub-titles on the book cover, e.g. "a new holiday parody—for Mom and Dad," clearly provide additional cues that distinguish the marks on the cover of *Elf Off* from *Elf On.*

Plaintiff urges the court to limit its analysis of the existence and effect of the parody in Defendant's work to a review of only the cover of each book and to the domain names alone, citing as authority a case in which the infringer used a domain name identical to the trademark—www.peta.org—for the proposition that the par-

---

**4.** For examples of Carroll's poetic parodies, see http://www.durrant.co.uk/alice/.

ody must be immediately recognizable. *PETA*, 263 F.3d at 367.

However, the Fourth Circuit subsequently expanded and distinguished *PETA*'s holding in a case that more closely matches the facts at issue here, *Lamparello v. Falwell*, 420 F.3d 309 (4th Cir.2005). In that case, the defendant used a strikingly similar domain name, www.fallwell.com, to criticize the views held by Jerry Falwell, who claimed common law trademark ownership of Falwell and presented his views on www.falwell.com. The Fourth Circuit clarified in *Lamparello* that *PETA* should *not* be interpreted as suggesting that courts should analyze an allegedly infringing title without any reference to context. *Id.* at 316. Rather, courts should consider an "allegedly infringing domain name in conjunction with the content of the website identified by the domain name." *Id.*

Similarly, another court in this district has found in a persuasive, detailed decision that consumers are able to interpret meaning from context in order to distinguish a parody from the original. *Smith*, 537 F.Supp.2d at 1328. An allegedly infringing parody should be considered in context. Defendant's use of Plaintiff's marks must be considered in relation to both the contents and cover of the book in deciding whether Defendant has created a parody.

Acknowledging the similarities between the two covers, the Court finds this question is very close for trademark purposes. Nonetheless, Defendant has included a statement on its book cover that it is a parody, with a boldface emphasis on "parody," a disclaimer on the back and the inside pages, a sub-title indicating that the book is for "Mom and Dad," and multiple other visual cues that *Elf Off* does not purport to be Plaintiff's book (*see supra* Section II). The overall impact, though somewhat subtle, is to present enough visual information to flag for consumers that the book is a parody for adults.[5] Defendant's website, www.elfofftheshelf.com (as opposed to Plaintiff's website, www. elfontheshelf.com), presents the book cover immediately on arrival at the site and thus similarly communicates that the book and website parody the original.

### 2. Copyright Infringement: Fair Use Analysis

■ The Court now considers whether Plaintiff has a substantial likelihood of success on the merits of its copyright claims to warrant the entry of a preliminary injunction. Plaintiff argues that Defendant has unlawfully appropriated the copyrighted images of the elf doll and the elf sitting on the shelf.

The first step in evaluating Plaintiff's likelihood of success on the merits is to assess whether Plaintiff has established the prima facie elements of a copyright infringement claim: the plaintiff owns a valid copyright and the defendant copied original elements of the plaintiff's work. *Suntrust*, 268 F.3d at 1266. The parties do not dispute these elements. Rather, they dispute whether Defendant's copying

---

**5.** Defendant could have done a better job of conveying to consumers looking at the book jacket that *Elf Off* is a parody and *not* a sequel to *Elf On*. A different font stacked in the same way as Plaintiff's would similarly have more sharply distinguished the two books. Embellishing the image of the elf dangling off the shelf in a humorous "naughty" way similarly would have more evocatively communicated the parodic nature of the book. Although Plaintiff has not established a *likelihood* of consumer confusion arising as a result of the book's cover, the facts at this early stage of the case do suggest an arguable *possibility* of consumer confusion. Plaintiff potentially could present survey evidence proving consumer confusion at trial. In light of this, Defendant may wish to consider taking additional measures to distinguish the cover of *Elf Off* before marketing it.

of some elements of Plaintiff's copyrighted works constitutes actionable infringement or protected fair use.

Four factors should be considered in analyzing a parody defense to a claim of copyright infringement under the fair use doctrine codified in the Copyright Act: the purpose and character of the use, the nature of the copyrighted work, the amount and substantiality of the portion used, and the effect on the market or value of the copyrighted work. 17 U.S.C. § 107. Having found *Elf Off* to be a parody, the Court next considers the fair use factors.

**a. Purpose and Character of the Work**

The first fair use factor involves two elements, the commercial or nonprofit nature of the work and the extent to which the work makes a "transformative" use of the original. *Suntrust,* 268 F.3d at 1269.

 *Elf Off* clearly serves a commercial purpose, as Defendant's goal in creating the book is to make a profit. However, the commerciality of the purpose falls within a normal book publication spectrum. By contrast, "[t]he use, for example, of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use inquiry than the sale of a parody for its own sake ..." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 585, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). In other words, when the parody itself is the product being sold, the use is less commercial in nature than if the parody was simply part of the advertisement for a differ-

ent consumer product. Here, Defendant's parodic use of the copyrighted elements is strictly "for its own sake," and thus the commercial nature weighs only somewhat against a finding of fair use.

 Further, the commercial nature may be mitigated by a "transformative" use of the copyrighted work, the second element of this factor.[6] *Id.* at 579, 114 S.Ct. 1164. To determine whether a use is transformative, "[t]he inquiry is 'whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *Suntrust,* 268 F.3d at 1269.

In *Suntrust,* the Eleventh Circuit found a critical parody of *Gone With the Wind* (GWTW) to be a transformative use. *Id.* "It is principally and purposefully a critical statement that seeks to rebut and destroy the perspective, judgments, and mythology of GWTW." *Suntrust,* 268 F.3d at 1270. In making war against the original, *The Wind Done Gone* (TWDG) ultimately "demystif[ied]" and "strip[ped] the romanticism" from the original. *Id.* at 1270. In TWDG, the characters (all inversions of characters in GWTW) became the vehicle for a parody, contradicting the racist assumptions enshrined in the original book.

*Elf Off* clearly makes transformative use of the copyrighted elf doll. Plaintiff's only use of the copyrighted elf doll is as a free-standing doll, which parents can move around the house to create the impression

---

6. The weight courts give to the commercial purpose element changed after the Supreme Court clarified in *Campbell* that it was not outcome-determinative: "If indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism ... since these activities 'are generally con-

ducted for profit in this country.'" 510 U.S. at 584, 114 S.Ct. 1164 (internal citations omitted). This is one reason the Court does not find *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.,* 642 F.Supp. 1031 (N.D.Ga.1986), heavily relied on by Plaintiff, persuasive in this case. Its analysis of the copyright and trademark infringement factors in a parody context is outdated, if not expressly overruled.

that it has a magical life of its own. Defendant depicts the doll in rather unromantic settings that similarly demystify the magical idea of the elf doll in *Elf On.* The elf doll in *Elf Off* is the vehicle for the parody.

▬ Defendant used an image almost identical to Plaintiff's sitting elf image in two photographs of what looks like but is not Plaintiff's book.[7] (Compl. Ex. H at 5.) This use furthers Defendant's attack on Plaintiff's work by showing the book covered with clearance stickers and next to a *Zombie Slayer* DVD on the back cover of Defendant's book.

Defendant also used an inverted variation of the sitting elf image on the cover, an elf dangling from a shelf. However, that image includes a more realistic depiction of the elf doll than the sitting elf image. Because it does not do much to advance Defendant's story or convey commentary, the dangling elf use does not appear to be as transformative as the photos of the elf doll or the defaced images of Plaintiff's book. However, because it does transform the original sitting elf image in the context of a parody, it still constitutes a transformative use.

. This factor overall points in favor of fair use, for Defendant appropriated the copyrighted elements for a transformative use, and not simply "to avoid the drudgery in working up something fresh...." *Campbell,* 510 U.S. at 580, 114 S.Ct. 1164.

**b. Nature of the Copyrighted Work**

▬ The second factor grants highest copyright protection to "original, creative works," and less protection to "derivative works or factual compilations." *Suntrust,* 268 F.3d at 1271. This factor is generally neutral in parody cases, due to their reliance on well-known creative works. *Id.*

**c. Amount and Substantiality of the Portion Used**

▬ To succeed in its purpose, a parody must take enough identifiable elements from the original work to create the reference to the original work. *Id.* at 1273. "When parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." *Campbell,* 510 U.S. at 588, 114 S.Ct. 1164.

▬ In creating a parody, the parodies may need to borrow the "heart" of the original to make its reference. *Campbell,* 510 U.S. at 588, 114 S.Ct. 1164. The elf doll and the sitting elf image are certainly the "heart" of the *Elf On* book. However, Plaintiff's copyright claims are for Defendant's use of the elf doll and sitting elf image—not the entire book.

Viewed in this way, it is clear that Defendant borrowed the entire sitting elf image in two places and a substantial portion of it on the front cover. Defendant also used the entire elf doll, but did change the color of its clothes. However, these images make up only a small proportion of *Elf Off.*

In a similar case, Mattel, Inc. brought copyright infringement claims against a photographer who took photographs of Barbie dolls in bizarre settings: a row of four Barbies wrapped in tortillas, covered in salsa, in a casserole dish in the oven (entitled "Barbie Enchiladas"); Barbie on a malt machine; and other "various absurd

---

**7.** While this image of the book does include a nearly exact replica of the sitting elf image, the photograph is a very small portion of Defendant's work and primarily provides a distinguishing reference to the original.

Where the reference to an original copyrighted work is small in proportion to the whole, the use may be considered "inconsequential." *See Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 611 (2d Cir.2006).

and often sexualized positions." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 796 (9th Cir.2003). The artist claimed he did so to create a parody that attacked the objectified image of women that Barbie promoted. *Id.* The Court noted, in considering the amount and substantiality of the copyrighted work used, that it would be rather difficult to use only a portion of a doll, and that the elements the defendant added to the dolls helped on this factor. "Here because the copyrighted material is a doll design and the infringing work is a photograph containing that doll, Forsythe, short of severing the doll, must add to it by creating a context around it and capturing that context in a photograph." *Id.* at 804.

Defendant here has similarly used Plaintiff's copyrighted works in whole, but only as a portion of a new and different creative work. The Court finds the amount and substantiality of elements borrowed and modified for Defendant's story are reasonable.

#### d. Effect on the Market Value of the Original

The fourth fair use factor is concerned with the potential for market substitution of the allegedly infringing work.

▮ Plaintiff has not clearly explained exactly how Defendant's use of the copyrighted works affects the market for those particular works. Nothing in the record indicates the elf doll or sitting elf image, independent from the book, have any market value whatsoever. Plaintiff has not represented that it sells the elf doll independently from the book. If that were the case, it seems highly unlikely that Defendant's book of photographs of the elf doll would replace sales of the actual elf doll. Similarly, it is unclear how the sitting elf image may be replaced in the marketplace, since it does not appear to have any particular market. Plaintiff has not argued that its potential market for licensing the sitting elf image has been or will be replaced by the dangling elf image or the photographs of Plaintiff's book cover with the sitting elf image. Plaintiff has neither identified a particular market for the sitting elf image nor presented any argument for how the apparently nonexistent market will be affected by Defendant's work.

Plaintiff instead argues that Defendant's uses will overall degrade the value of the market for its *Elf On* book. The flaw in this argument is that Plaintiff has not alleged infringement of the story contained in *Elf On.*[8] Even accepting Plaintiff's contention that the relevant market at issue here *is* for Plaintiff's book, it is highly unlikely that consumers will choose an inappropriate-for-children parody in lieu of the wholesome *Elf On.*

Although Plaintiff cites as evidence Defendant's stated goal of knocking a holiday favorite off its perch, such evidence does not indicate that Defendant's book will *replace* sales of Plaintiff's product. (Pl.'s Br. Supp. Mot. at 6.) Even assuming some

---

**8.** While the idea superficially makes sense, this argument tends to conflate trademark and copyright. If Plaintiff is arguing that the use of a logo similar to the logo on its book will confuse consumers as to the source of the book, and therefore will cause Plaintiff's book market to be supplanted, this argument belongs with its trademark claims. To succeed on its copyright claims, Plaintiff must identify the market for the elf doll and sitting elf image and explain how this market is affected by Defendant's book. If Plaintiff truly intends to argue Defendant's book will deplete its market for *Elf On*, Plaintiff must bring copyright claims for the book itself, not merely logos and products related to it. Plaintiff must clearly explain how and why an allegedly infringing use will replace the original or any derivative works in the marketplace. *See Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir.2001) (" '[E]vidence about relevant markets' is also crucial to the fair use defense." *Id.* (citing *Campbell*, 510 U.S. at 590, 114 S.Ct. at 1177)).

market for the copyrighted elf doll and sitting elf image, this factor does not involve the effect that any criticism or commentary within a parody may have on the overall market value of the original. *Id.* at 1274. As a critical commentary, *Elf Off* may knock Plaintiff's work down without affecting this factor. Plaintiff, in sum, has not clearly demonstrated any relevant effect on its market. Thus, this factor supports a finding of fair use.

### e. Copyright Likelihood of Success

Plaintiff has failed to meet its burden of proving at this stage a substantial likelihood that Defendant's fair use defense will not succeed. *See Suntrust,* 268 F.3d at 1276 (plaintiff seeking an injunction must refute the fair use defense where defendant has asserted it). Therefore, Plaintiff has not established a substantial likelihood of success on the merits of its copyright claims.

### 3. Trademark Infringement: Likelihood of Confusion

The Court next considers whether Plaintiff has a substantial likelihood of success on the merits of its trademark claims to warrant the entry of a preliminary injunction.

Plaintiff alleges both federal and common law trademark infringement. In Georgia, common law trademark claims "involve the same dispositive issues as the claims under the Lanham Act." *Ferrellgas Partners, Inc. v. Barrow,* 4:03–CV–107–WDO, 2006 WL 372602 (M.D.Ga. Feb. 16, 2006). "[T]o prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mis-

take." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1307 (11th Cir.1998).

As Defendant has reserved the questions of whether Plaintiff owns the marks at issue and whether the marks are eligible for trademark protection,[9] the Court assumes for the purposes of this motion that Plaintiff has a right in the marks at issue and that they are eligible for protection. Plaintiff argues that its word mark is infringed by Defendant's book title and domain name, its stylized word mark is infringed by Defendant's similar font for the title of *Elf Off,* and its sitting elf logo is infringed by Defendant's use of the dangling elf image on the front cover.

The second element for both federal and common law trademark claims is whether the Defendant has adopted a mark similar to the protected trademark that is likely to cause consumer confusion. *Tana v. Dantanna's,* 611 F.3d 767, 773 (11th Cir.2010) (citing *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 358 (11th Cir.1997)). The likelihood of confusion element poses the greatest difficulty in the case, and thus comprises the bulk of the Court's analysis of Plaintiff's trademark claims.

The parties agree for purposes of this motion that the trademarks at issue are strong and that Defendant's book uses similar marks. Plaintiff argues that Defendant's use of its marks will cause consumer confusion as to the source of Defendant's book. Plaintiff further argues that Defendant has borrowed its marks in an attempt to capitalize on Plaintiff's success, and that Defendant has not in fact created a parody at all. Defendant contends that its use of Plaintiff's marks was required in order to create a parody of Plaintiff's book, and as a parody, its use is not infringing.

---

**9.** Defendant argues that "Plaintiff is not entitled to the relief sought even if ownership and validity are established." (Defs.' Mem. Opp'n Mot. at 3.)

The Eleventh Circuit has identified seven factors for the Court to consider to determine the likelihood of confusion: (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public. *Tana*, 611 F.3d at 774–75.

■■■ Use as a parody is not a defense in trademark infringement but is a factor that "influences the way the likelihood of confusion factors are applied." *Smith*, 537 F.Supp.2d at 1317. The Court now considers each of the likelihood of confusion factors in turn. Because Defendant's domain name is identical to the title that allegedly infringes Plaintiff's word mark, and the website prominently displays the image of the book cover, the Court's evaluation of these factors in the context of the book cover applies equally to Defendant's website.

### a. Strength of Plaintiff's Mark

"The 'strength' of a mark is the measure of its distinctiveness." *Id.* at 1335. Here the parties both claim that Plaintiff's marks are strong. In general, the stronger the mark, the higher the protection the mark receives.

■■■ In a parody case, the strength of the plaintiff's mark may reduce the likelihood of confusion, as consumers are more likely to recognize the defendant's use is in jest. *Id.* (citing *Hormel Foods Corp. v.*

*Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir.1996)). In *Smith*, the defendant borrowed ubiquitous Wal–Mart marks to criticize the brand through parody. Due to the widespread consumer recognition of the Wal–Mart brand, the court found that consumers were unlikely to mistake the parody for the original, noting that "parody depends on lack of confusion to make its point." *Smith*, 537 F.Supp.2d at 1335.

■■■ In this case, although both parties agree that Plaintiff's marks are "strong," the Court is not certain Plaintiff's marks are particularly distinctive. The use of an elf in a Christmas-theme gift set is not a unique idea. At best, *Elf On* is well known within a particular sub-set of the population. This sub-set comprises both Plaintiff and Defendant's target audience. For purposes of this motion, because the parties contend the mark is strong, the Court assumes the mark is strong.[10] Given that with parody a strong mark reduces the likelihood of confusion, this factor weighs in favor of Defendant.

### b. Similarity of Marks

■■■ A successful trademark parody borrows some of the original mark in order to make its commentary on the senior mark. *Id.* at 1336. The debate in such a case is "whether [Defendant's] designs contained so much [of Plaintiff's] indicia that they became ineffective as parodies and instead appeared to be actually associated with or sponsored by" Plaintiff. *Id.* Here, Plaintiff argues that Defendant has borrowed so much of the cover and the marks included therein that consumers will be confused or consider *Elf Off* a "sequel" affiliated with or sponsored by *Elf On*. Conversely, Defendant acknowledges it has borrowed Plaintiff's marks, but de-

---

**10.** While proceeding on this premise, the Court's ruling does not definitively establish the strength of Plaintiff's mark.

fends its actions by saying the publication needed to borrow enough of the marks to make the reference requisite for effective parody.

Where the marks share similar sight, sound, and meaning, and are used to denote similar products, this factor generally weighs in favor of the plaintiff. *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1337 (11th Cir.1999). In this case, at minimum, the sight and sound are extremely similar. Defendant borrowed the same font style Plaintiff trademarked, modifying only the color. Changing the final consonant in one preposition (the change from "on" to "off") does very little to distinguish the two titles in terms of sound. (On the other hand, the meaning of "*off* the shelf" is obviously somewhat different than "*on* the shelf.")

■ "[S]omewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression such as a parody." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 495 (2d Cir.1989) (finding parody of *Cliffs Notes* books to be non-infringing where multiple distinguishing factors were included).

Although at first glance consumers might not notice all the distinctions between the two products, the first glance is not decisive. The Court is concerned primarily with whether the ordinarily prudent consumer would be confused. *Id.* Courts have tolerated momentary confusion where it can be readily dispelled upon further consideration prior to purchase. "That a person cannot tell the difference between the two from across the room matters little." *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1229–30 (7th Cir.1993) (overturning summary judgment for plaintiff because a jury could find use of "Mike" over a Nike swoosh on an advertised t-shirt was parodical and would not confuse the consuming public engaged in the purchasing process, "as MIKE and NIKE, in text, meaning, and pronunciation, are not so similar as to confuse consumers, especially when making the decision to purchase or not to purchase.") In *Yankee Pub. Inc. v. News America Pub. Inc.*, 809 F.Supp. 267 (S.D.N.Y.1992), *New York* magazine published an issue using a parody of the *The Old Farmer's Almanac* cover and contents, presenting for its annual Christmas gift issue a tongue-in-cheek list of "thrifty" gift ideas. The joke turned on the contrast between *New York*'s message of "frivolous trendy, inconstant, stylish, changeable, urbane glorification of consumption" and the *Almanac*'s advocacy of "rusticity, thrift, homespun good sense, homely time-honored adages, practicality, permanence" and a general rejection of *New York*'s values. *Id.* at 271. The court found no likelihood of confusion, in spite of plaintiff's concern that consumers might not immediately recognize the parody from viewing the cover alone. "Even if the first glance at the cover were to cause momentary confusion, a further look into the magazine would dispel it." *Id.* at 273.

Reasonable consumers faced with purchasing a children's book are likely to open the book to see what they are buying for their children. Upon examination of Defendant's book, consumers, even without opening it, can see the smaller size font informing them that the book is a "parody" and "for Mom and Dad." Looking inside, they are likely to find on any given page an indication they are not looking at a children's book. They may find Defendant's disclaimer stating it is not affiliated with Plaintiff. They may see the bizarre rhymes about "that stupid toy train" or Barbie being a prude. They may notice the photographs of an elf watching x-rated videos like "Elves Gone WILD." These multiple distinctions go far to dispel consumer confusion. They also further address the larger question of whether

Defendant has borrowed so much of Plaintiff's work that the parody becomes a copy. Consumers, particularly those buying books, are likely to notice significant literary distinctions. This factor therefore weighs in favor of Defendant.

### c. Similarity of Products

■ "This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338. If "the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods," this factor indicates a likelihood of consumer confusion. *Id.*

■ Since both parties are selling books, one of which comes with a toy doll, reasonable consumers could assume both books came from the same source. Although arguably the inclusion of the elf doll with Plaintiff's book makes it a slightly different product,[11] consumers may assume Defendant's book is a related derivative work produced by the same source as the original.

However, in cases where courts have found significant differences notifying consumers that one of the marks is a parody of the other, even identical products have been treated as a neutral factor. *See, e.g., Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir.1987) (finding parody of Jordache jeans, "Lardashe" jeans, to be non-infringing); *Black Dog Tavern Co., Inc. v. Hall*, 823 F.Supp. 48 (D.Mass.1993) (finding Black Hog and Dead Dog t-shirts that parodied Black Dog

t-shirts to be non-infringing, because consumers would notice a difference between a hog and a dog and would not assume the macabre overtones of the Dead Dog related to the Black Dog).

Because some amount of similarity is required to accomplish the parody, it is difficult to imagine how Defendant could have created its parody without a book, although this book need not have been identical in length and width dimensions or "first glance" presentation as *Elf On.* Defendant notably did not include an elf doll, which suggests this factor weighs only slightly in favor of Plaintiff.

### d. Similarity of Sales Methods and Customers

This factor considers which consumers buy the parties' products as well as where and how they buy them. *Frehling*, 192 F.3d at 1339. Sales in similar stores, for example, may provide strong evidence of likelihood of confusion.

■ Plaintiff complains of the overlap in sales methods, as Defendant plans to market its book using some or most of the same major retail outlets as Plaintiff, including Amazon.com and Barnes and Noble. Defendant points out that its book targets an entirely different audience than Plaintiff's. Plaintiff's counsel argued that both children and adults buy *Elf On* and will be confused and mistakenly buy Defendant's book. However, the Court finds that parents are usually the purchasers even when the target audience for a book is children, so the argument that child consumers will be confused is not persuasive.

---

**11.** Notably, the inclusion of the doll with the book in one package entitles the Plaintiff to trademark *The Elf on the Shelf* title, whereas book titles are not normally eligible for trademark protection without proof of secondary meaning. "[U]nlike ordinary marks, literary titles of single works which are inherently distinctive are not accorded immediate protection, absent proof of secondary meaning and consumer recognition." 2 McCarthy on Trademarks and Unfair Competition § 10:2 (4th ed.).

Defendant's book targets the parents of children who have come to know and love Plaintiff's book. However, this distinction between readers of the two books does not significantly change the demographics of the customers. Parents of children interested in *Elf On* are the target consumers for both products. The parties share multiple sales methods. This factor weighs in favor of Plaintiff.

### e. Similarity of Advertising

The parties' advertising strategies, at this early stage, appear to target the same online outlets they are using to market their products. Although Plaintiff submitted evidence at the hearing related to online searches for its books, such evidence does not go to the heart of Defendant's advertising strategies. It is unclear, for example, whether Defendant has worked with internet search providers in order to make its product or website show up in searches for Plaintiff's product. This information may be revealed through discovery. Although the overlap in online markets as advertising suggests this factor may weigh in favor of Plaintiff at trial, with the minimal evidence Plaintiff has presented, this factor is neutral at this stage.

### f. Defendant's Intent

Plaintiff argues that Defendant's actual intent is to use Plaintiff's successful mark as a commercial reference point, without regard to any interest in parody. Defendant argues its intention was to capitalize on a current successful trend of publishing adult parodies of children's books. Defendant further points to the use of the word "parody" on the cover to indicate to consumers the book is published as a parody, rather than a sequel or other derivative work. A real intent to parody may be strong evidence that the alleged infringement was not motivated by an intent to confuse the public. *See, e.g., Jordache*, 828 F.2d at 1486.

Defendant also included a disclaimer of affiliation inside the book. Where a defendant included both a clear disclaimer and some form of criticism, this factor has been considered to weigh in favor of the defendant. *Smith*, 537 F.Supp.2d at 1338. Here, Defendant includes both criticism in the form of parody and a disclaimer. Thus, this factor weighs in favor of Defendant.

### g. Existence of Actual Confusion

Plaintiff has presented no evidence of actual consumer confusion. This evidence is frequently a key factor in finding likelihood of confusion in trademark parody cases. *See, e.g., Anheuser–Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 772 (8th Cir.1994) (finding a fake magazine advertisement for "Michelob Oily" to be infringing where the ad was too similar to Michelob's marks and included no disclaimer of association, and plaintiffs presented survey evidence of consumer confusion); *Anheuser–Busch, Inc. v. VIP Products, LLC*, 666 F.Supp.2d 974, 977 (E.D.Mo.2008) (granting preliminary injunction to plaintiff who showed survey evidence that consumers could not tell whether defendant's "Buttwiper" dog toy was associated with Budweiser); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 246 (S.D.N.Y.1994) (finding defendant's "Dom Popignon" popcorn sold in a champagne-bottle shaped package infringed plaintiff's Dom Perignon mark, where plaintiff presented survey evidence of consumer confusion). Absent such evidence, at this stage, this factor is neutral.

### h. Trademark Likelihood of Success

Some parodies may indeed confuse consumers. When they do, however, they often lack expressive elements or clear indications of parody. *See, e.g., Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456 (2000) (finding defendant's herbal supplement entitled "Herbrozac" to infringe

plaintiff's mark "Prozac" where Herbrozac was marketed as a mood enhancer and made no humorous or critical reference to Prozac); *Anheuser–Busch,* 28 F.3d 769; *Anheuser–Busch,* 666 F.Supp.2d 974; *Schieffelin,* 850 F.Supp. 232.

Where some aspect of the work clearly communicates to consumers that it is a parody, or where the medium in which the marks are used is inherently expressive (such as artistic photographs), courts protect that expression. *See Smith,* 537 F.Supp.2d 1302, (finding parodies of Wal–Mart marks to be non-infringing as they incorporated critical commentary); *Cliffs Notes,* 886 F.2d 490; *Black Dog,* 823 F.Supp. 48; *Jordache,* 828 F.2d at 1486; *Yankee,* 809 F.Supp. 267. See also, *Lucasfilm Ltd. v. Media Market Group, Ltd.,* 182 F.Supp.2d 897, 901 (N.D.Cal.2002) (in case involving a pornographic film parodying the famous *Star Wars* movies, preliminary injunction denied because "no reasonable consumer is likely to be confused between *Star Wars* and *Starballz,* which is labeled as an adult film, is animated, and is rarely sold in the same marketing channels as *Star Wars*.").

■ While the two books in this case may be in the same marketing channels, Defendant's book is labeled as a parody for parents and its primary pictorial content consists of absurd photographs rather than soft edged watercolor illustrations intended to appeal to children. "Denying parodists the opportunity to poke fun at symbols and names which have become woven into the fabric of our daily life, would constitute a serious curtailment of a protected form of expression." *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 34 (1st Cir.1987) (finding that First Amendment rights trumped trademark claims when defendant created "prurient parody" of the L.L. Bean catalog).

The Court finds that the balance of the factors weighs against a finding of likelihood of confusion. Plaintiff holds a mark that its consumers are likely to recognize in a parody. Defendant has included distinctions between its marks and Plaintiff's to minimize consumer confusion, although the Court recognizes the first impressions of the books covers may result in some minor initial consumer confusion. The differences between the marks in context sufficiently outweigh the similarities in product and sales methods. Finally, Defendant has clearly made a good-faith effort to parody Plaintiff's work. Its efforts include a disclaimer and the use of the word "parody" in boldface on the cover of the book. The Court finds these steps sufficiently distinguish the marks, identify the parody, and reduce any likelihood of confusion. Similarly, because the domain name leads to a website that includes Defendant's book cover, the overall impact is to convey parody, not to confuse consumers.

### C. Irreparable Harm, Balance of Harms, and Public Interest

■ Plaintiff has asserted it will suffer irreparable harm with regard to its copyright claims without a preliminary injunction. Even if Plaintiff had adequately shown a likelihood of success on the copyright claims, which would generally support a presumption of irreparable harm, "the Supreme Court has made clear that there is no presumption of irreparable injury when the alleged infringer has a bona fide fair use defense." *Suntrust,* 268 F.3d at 1276. Plaintiff has neither met its burden with regard to likelihood of success nor identified any irreparable harm other than the presumed harm that is rejected in the face of a fair use defense.

■ A strong likelihood of confusion caused by trademark infringement may constitute threat of irreparable harm. *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir.1985). Having failed to make an

adequate showing of likelihood of confusion, Plaintiff is not entitled to a presumption of irreparable harm from the alleged trademark infringement. Moreover, Plaintiff has not presented any evidence of irreparable harm in connection with its trademark claims. Thus, Plaintiff has failed to meet its burden with regard to irreparable harms.

■ The Court next weighs the potential harm to the parties respectively. Defendant projects significant loss of sales if enjoined from distributing its book prior to the holiday season. Defendant plans to debut *Elf Off* for sales around the 2011 holiday season. A preliminary injunction until a trial on the merits would eliminate this prime time for Defendant's book marketing. Further, Defendant's counsel argued that F + W Media hopes to take advantage of a growing trend of made-for-adult parodies of children's books, a fad that may end before a trial on the merits is completed. In short, Defendant has identified a narrow window of time for sales that could be erased entirely if its publication is enjoined on a preliminary injunction. The Court concludes that Defendant's potential harm here outweighs the more speculative risk of harm alleged by Plaintiff.

■ With regard to the public interest, both trademark and copyright law offer protection for parodic use of intellectual property, consistent with the strong public interest in protecting free speech and expression. Thus, in a case presenting a parody that criticizes an original work, the public interest in protecting that expression is of the highest level.

## IV. CONCLUSION

Plaintiff has failed to meet its high burden for preliminary injunctive relief. Consequently, the Court **DENIES** Plaintiff's motion for preliminary injunction [Doc. 2].

Exhibit A